687 A.2d 1074

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JEFFREY DISHON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 30, 1996—Decided February 6, 1997.

258

Before Judges HAVEY, BROCHIN and EICHEN.

*Susan L. Reisner*, Public Defender of New Jersey, attorney for appellant (*Thomas J. Gosse*, Designated Counsel, on the brief).

*Peter Verniero*, Attorney General of New Jersey, attorney for respondent (*Catherine A. Foddai*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

At issue in this criminal appeal is: (1) whether defendant was deprived of a fair trial where the trial judge denied defendant's request to be present during an *in camera voir dire* of prospective jurors, and the *voir dire* was conducted after defendant had exercised all of his peremptory challenges; and (2) whether the judge erred in admitting into evidence the results of DNA polymerase chain reaction (PCR) testing to link defendant with the crimes.

We conclude that the procedure followed by the trial judge deprived defendant of his fundamental right to be present during a critical stage of the criminal proceeding and of his substantial right to exercise his peremptory challenges in a knowing and meaningful way. We therefore reverse defendant's aggravated manslaughter and weapons possession convictions and remand for retrial. For purposes of the retrial, we reject defendant's array of challenges to the admission of the PCR–DNA test results, and conclude that the evidence was properly admitted.

Under a Monmouth County indictment, defendant was charged with first-degree purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1) and –3a(2); first-degree felony murder, *N.J.S.A.* 2C:11–

3a(3); armed robbery, *N.J.S.A.* 2C:15–1; unlawful possession of a weapon, *N.J.S.A.* 2C:39–5d; possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d; and theft of movable property, *N.J.S.A.* 2C:20–3a. He was tried by a jury and found guilty of felony murder. He was acquitted of purposeful or knowing murder and armed robbery, but found guilty of the lesser-included offenses of aggravated manslaughter and second-degree robbery. He was also found guilty of the weapons possession charges and theft of a vehicle.

We reversed defendant's convictions by opinion dated April 20, 1989 (A–2017–85T4), and remanded for a new trial. Prior to retrial, the State moved to admit the results of PCR–DNA evidence to link defendant with the crimes.[1] The trial judge ruled that PCR–DNA testing was generally accepted as a reliable scientific testing procedure and that no pretrial hearing was necessary with respect to that issue. However, the judge conducted a lengthy *Frye*[2] hearing to determine whether: (1) the procedures followed were reliable; (2) the polymerase used (Taq) was sufficiently reliable; and (3) the statistical analysis and quantification of the test result was sufficiently reliable to be admitted at trial. After the hearing, during which expert evidence was presented by both sides, the judge ruled that the PCR–DNA evidence proffered by the State was admissible.

After a trial by jury, defendant was acquitted of felony murder and robbery, but convicted of aggravated manslaughter, the weapons possession charges, and third-degree theft of a vehicle and other personal property valued over $500. For aggravated manslaughter, defendant was sentenced to a twenty-year custodial term, with a ten-year period of parole ineligibility, to be served consecutively to a term that defendant was serving on an unrelat-

---

[1] PCR is a technique for determining DNA composition. Unlike the Restriction Fragment Length Polymorphism (RFLP), or DNA fingerprinting method, PCR does not require as large or as pristine of a sample to determine DNA type.

[2] *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

ed conviction. A concurrent five-year term was imposed on the possession of a weapon for an unlawful purpose conviction and a concurrent eighteen-month term was imposed on the unlawful possession of a weapon conviction. A consecutive five-year term with a two-and-one-half-year period of parole ineligibility was imposed on the theft conviction.

On appeal, defendant raises the following points:

*Point I*—The introduction of the DNA evidence produced through the polymerase chain reaction (PCR) procedure denied defendant his right to a fair trial.

A. The population frequency statistics used by the State are unreliable.

B. In the alternative, the court's failure to apply the ceiling principle with regard to the statistical evidence denied the defendant a fair trial.

C. The State has not proven that proper protocol and procedures were followed by Dr. Blake in this case; therefore, admission of the PCR–DNA evidence against the defendant denied him a fair trial.

D. The State's failure to produce Jennifer Mahovolich [sic] to testify renders the PCR–DNA test results inadmissible.

E. The court's decision to take judicial notice that the PCR procedure is scientifically reliable and acceptable denied the defendant a fair trial.

F. The erroneous admission of PCR–DNA evidence was not harmless.

*Point II*—Prohibiting the defendant from being present at the in camera inquiry with each juror concerning the issue of homosexuality denied defendant his right to a fair trial.

*Point III*—The court's ruling that the defense was not permitted to examine witnesses or introduce evidence which indicated that the victim was involved in sadomasochism and had suffered bruises and injuries during the two months preceding his death denied the defendant his right to a fair trial.

*Point IV*—Testimony of Detective[s] Holmes and Sommer that the defendant was finger-printed at least three days before the crime committed in this case denied the defendant a fair trial.

*Point V*—The admission of what the State alleged to be Mr. Dishon's weight when he was admitted into the county jail denied the defendant a fair trial.

*Point VI*—Allowing the State to introduce evidence that defendant supposedly carried a weapon and/or knife denied the defendant his right to a fair trial.

*Point VII*—Admission of evidence that defendant supposedly told Steven Van Dusen that he hurt someone real bad and might have killed him denied the defendant the right to a fair trial.

*Point VIII*—Certain statements made by the prosecutor were improper and deprived the defendant of a fair trial.

*Point IX*—The judge erred in denying the defendant proper credit (jail credits) from the time of the reversal of his murder conviction to the time of his new sentence.

*Point X*—The sentence imposed against defendant is excessive.

*Point XI*—The sentence imposed under this indictment should have been concurrent to defendant's sentence under Indictment No. 366–2–85 because his plea agreement for that indictment specifically required that the sentences under both indictments be concurrent.

The State presented evidence establishing that the victim, Norman Anctil, was found dead in his Sea Bright apartment on December 4, 1984. There was blood spattered on his body, clothing and on his apartment furniture and wall. The top of his jeans was open and the zipper was halfway down. The police found a pair of white jeans on the bedroom floor with blood stains on the left thigh area.

Investigation revealed that a Seiko watch, stereo and television set had been taken from Anctil's apartment. There was no evidence of forced entry. A latent fingerprint lifted from a glass door in the apartment was later found to be a positive match with defendant's fingerprint.

Anctil had been stabbed thirty-six times and an autopsy revealed that the cause of death was blood in the plural cavities due to lacerations of the heart. According to the coroner, Anctil died between 10 a.m., December 2 and 10 a.m., December 3, 1984.

The police investigation centered on the fact that the homicide may have been homosexually related, in part based on interviews with Anctil's co-workers. Also, bartenders at local gay bars recognized Anctil, and one recalled that Anctil was at a local bar on Saturday night, December 1, 1984. It was also determined that defendant frequented the gay bars in Asbury Park.

Shortly after Anctil's death, the investigators found Anctil's car in the area of defendant's Asbury Park residence. After the positive match of defendant's fingerprint with the fingerprint lifted from Anctil's apartment, investigators from the prosecutor's office arrested defendant at the home of a friend. The investigators

recovered Anctil's Seiko watch, television set, and bicycle from defendant's friends and family.

Defendant's ex-girlfriend testified that defendant often carried a knife. She stated that defendant laughed and spit at men standing outside gay bars, calling them "faggots," and that he told her he liked to rob them. She testified that defendant said all "faggots" should be dead and that he would "kill them in a New York second." In mid-December 1984, defendant admitted to her that he had killed a "faggot" in Sea Bright by stabbing him.

As a result of the pretrial ruling as to the admission of the PCR–DNA test results, the State was permitted to call Dr. Edward Blake, a forensic serologist. The PCR technique described by Dr. Blake was developed in 1985 by Cetus Corporation. *See State v. Williams,* 252 *N.J.Super.* 369, 380, 599 *A.*2d 960 (Law Div.1991). The procedure amplifies a specific region of DNA in a sufficient quantity to allow for its analysis. A targeted segment of DNA can be amplified in exact replicas a millionfold which can then be analyzed. *Ibid.* A scientist can select any section of interest from a DNA molecule, typically a single set of genes, amplify that part and thereafter easily analyze it. *Ibid.*[3]

---

[3] Judge Skillman in *State v. Marcus,* 294 *N.J.Super.* 267, 276–77, 683 *A.*2d 221 (App.Div.1996), recently described the scientific principles which underlie DNA analysis as follows:

> Every human cell with a nucleus contains a copy of the DNA of the individual to whom the cell belongs. DNA is a simple molecule in the shape of a curved double helix "ladder" composed of pairs of four nucleotides which pair off in each step of the DNA molecule ladder. There are approximately three billion such "base pairings" in the DNA of humans, which are carried on twenty-three pairs of chromosomes. About 99% of these base pairings are the same from person to person, accounting for such shared human characteristics as two legs, a nose and ten digits on the hands and feet. However, there are some regions within human DNA that vary greatly among individuals (except for identical twins who have identical DNA), which are referred to as "polymorphic" and which provide the basis for DNA identification. Although the examination of every polymorphic site is not currently feasible, an examination of a small number of select sites can establish a DNA profile of a cell sample that can be compared to the DNA profile of another cell sample.

Dr. Blake's laboratory examined the white jeans found in Anctil's bedroom. Dr. Blake described the methodology employed in removing sperm collected from a yellow stain on the jeans and the procedure followed in releasing DNA from the sperm to isolate the DQ alpha gene. Dr. Blake then explained how the DQ alpha gene was amplified and analyzed to determine its genotype.

Dr. Blake stated that the sperm recovered from two adjacent areas on the white jeans was found to contain DQ alpha alleles 1.2, 1.3. He explained that there are six alleles in the DQ alpha genetic marker system and that each person has two alleles, resulting in twenty-one possible genotype combinations. A specimen of defendant's blood was typed, revealing a 1.2, 1.3 DQ alpha genotype, the same as that contained in the sperm on the white jeans. Typing performed on Anctil's blood and hair revealed DQ alpha genotype 1.1, 3. Consequently, Dr. Blake determined that Anctil could not have been the source of the sperm.

Dr. Blake testified that he kept a record of how often different DQ alpha genotypes appear in different populations based on PCR–DNA testing performed by his laboratory on specimens from various victims and suspects across the United States. Dr. Blake's sample size for the Caucasian population was 730. According to Dr. Blake, the 1.2, 1.3 DQ alpha genotype occurred in twenty-three of these individuals, or approximately 3%.

Dr. Michael Conneally, a professor of medical genetics and neurology at Indiana University Medical Center, testified that he reviewed Dr. Blake's report which listed the frequency of occurrence of 1.2, 1.3 DQ alpha genotype as 3.5% in the Caucasian population and 2.5% in the Black population. Dr. Conneally characterized the 3.5% figure as reliable and conservative. He relied on a number of studies performed in the United States, all of which had results compatible with Dr. Blake's determination

DNA analysis involves (1) creating DNA profiles of evidence samples; (2) determining whether profiles match; and (3) if samples match, determining the statistical significance of the match.

respecting the percentage of Caucasians and Blacks having the 1.2, 1.3 DQ alpha genotype. Dr. Conneally characterized the findings of all these studies as consistent with each other and with Dr. Blake's results.

Defendant testified and admitted that he was in Anctil's apartment during the early morning hours of December 2, 1984, and stole Anctil's stereo, television, bicycle, watch and vehicle. He stated that when the bars closed at 2 a.m. on December 2, 1984, he went to Anctil's apartment with a male named "Jim," and that Jim and Anctil went into the bedroom and closed the door. After leaving Anctil's apartment with the stolen items, he drove Anctil's vehicle to an apartment in Asbury Park, where he fell asleep after moving the stolen property into the house. Defendant denied killing Anctil. He claimed that the white jeans found at the scene of the homicide did not belong to him. He acknowledged owning a knife at the time of Anctil's death, but denied carrying it all the time.

## I

Defendant contends that the trial judge's denial of his request to be present at a portion of the jury *voir dire* conducted in the judge's chambers denied him the right to a fair trial.

Defendant was present in the courtroom for a substantial portion of the jury *voir dire*. After reading the indictment to the jury and excusing several potential jurors [4] for hardship, the trial judge conducted a general inquiry of the fourteen jurors selected at random to sit in the jury box. He asked them such questions as whether: (1) they knew defendant or the attorneys; (2) they or any family member were involved in law enforcement; (3) they or any member of their family were the victim of crimes; (4) they had read any news articles regarding the case; and (5) the fact that the case involved homosexuality and an attitude towards

---

[4] We use the term "juror" rather than "potential juror" or "venire person" for purposes of brevity and consistency.

homosexuals would prevent them from rendering a fair and impartial verdict. Whenever a juror responded positively to any of the questions, the judge posed additional questions to that particular juror. The judge also made inquiry into the juror's occupation, residency, marital status and spouse's occupation. Whenever a juror was excused because of a peremptory challenge, the judge generally covered the same questions when a new juror was selected.

Juror number nine informed the judge during a side-bar conference that he was a homosexual. The juror claimed that this would not affect his judgment and that he could decide the case impartially on the evidence developed at trial. Defense counsel was present at this side-bar conference and posed questions to the juror. However, nothing in the record suggests that defendant was either present or was able to hear what transpired at side-bar. Neither attorney challenged the juror.

After defense counsel exhausted his allotment of twenty peremptory challenges, *see R.* 1:8–3(d), the judge announced that he would bring the jurors into his chambers one at a time so that he could ask them some additional questions in the presence of counsel and the court reporter. The judge explained that if counsel had exhausted their peremptory challenges, they could only challenge for cause. Defense counsel informed the judge that defendant wanted to be present during the additional *voir dire* in chambers. The judge denied the request for "reasons of security," but asked defense counsel to relay to defendant what was said by each juror.

The judge then called each of the fourteen jurors into chambers individually and informed them that there would likely be evidence in the case pertaining to homosexuality, homosexual relations and a viewpoint or attitude towards homosexuals. The jurors were asked whether they could put that aside and decide the case based upon the evidence. The jurors indicated that they could. The judge also inquired whether the jurors had any relatives, friends or co-workers whom they believed to be homosexual. In addition,

the jurors were asked whether they would weigh the testimony of a homosexual in the same manner as that of any other person. All of the jurors indicated that they would. Most of the jurors were also asked if they could give defendant a fair trial if it were revealed that he was homosexual or bisexual. The jurors indicated that they would.

One of the jurors, juror number four, informed the judge that he was "not sympathetic at all with homosexuality," but his view would not affect his decision. Another juror, number nine, who had previously informed the court that he was a homosexual, expressed the opinion that there was no relationship between an individual's sexual preference and his or her veracity. He also stated that if the evidence were to reveal that defendant was either a homosexual or bisexual, but had made disparaging remarks about homosexuals, he could put this aside and give defendant a fair trial based solely on the evidence.

None of the jurors were challenged as a result of what transpired during the *voir dire* in chambers. Jurors number nine and four both sat as deliberating jurors.

Defendant argues that his exclusion by the trial judge from the *in camera voir dire* deprived him of a fair trial because the *voir dire* "dealt with the central theme of the prosecution's case—bias against homosexuals." Thus, he was involuntarily excluded from a "*critical stage* of the trial," an error "of constitutional dimension" which mandates a new trial.

■ A criminal defendant has a constitutional right to be present at every critical stage of his or her trial, including the impaneling of the jury. *Hopt v. Utah*, 110 *U.S.* 574, 578, 4 *S.Ct.* 202, 204, 28 *L.Ed.* 262, 265 (1884); *United States v. Tipton*, 90 *F*.3d 861, 872 (4th Cir.1996); *United States v. Camacho*, 955 *F*.2d 950, 952–53 (4th Cir.1992); *United States v. Washington*, 705 *F*.2d 489, 496–97 (D.C.Cir.1983). The right is embodied in our *R.* 3:16(b): "The defendant shall be present at every stage of the trial, including the impaneling of the jury...." The right to be present is derived from the Sixth Amendment Confrontation

Clause, the Due Process Clause of the Fifth and Fourteenth Amendments, and the common law privilege of presence. *See United States v. Alessandrello,* 637 *F.*2d 131, 138 (3d Cir.1980), *cert. denied,* 451 *U.S.* 949, 101 *S.Ct.* 2031, 68 *L.Ed.*2d 334 (1981).

■ This fundamental right to be present during *voir dire* is essential because it is only by defendant's presence during jury impaneling that he can assist his attorney in the selection of an impartial jury. *United States v. Crutcher,* 405 *F.*2d 239, 244 (2d Cir.1968), *cert. denied,* 394 *U.S.* 908, 89 *S.Ct.* 1018, 22 *L.Ed.*2d 219 (1969). He is entitled to hear questions intended to disclose a juror's bias, hostility or predisposition to believe or discredit the testimony of potential witnesses, and the juror's answers so that he has the opportunity to assess the juror's facial expressions and demeanor. *People v. Antommarchi,* 80 *N.Y.*2d 247, 590 *N.Y.S.*2d 33, 604 *N.E.*2d 95, 97 (1992). A defendant may form impressions and prejudices based upon the "bare looks and gestures of" the juror. *Crutcher, supra,* 405 *F.*2d at 244. Thus, a defendant's presence is necessary so that he may effectively exercise his peremptory challenges. *Camacho, supra,* 955 *F.*2d at 953; *Boone v. United States,* 483 *A.*2d 1135, 1138 (D.C.1984).

We have found no published decision in New Jersey dealing generally with a defendant's absence from the jury *voir dire* process; however, cases from other jurisdictions have held that a defendant's absence is subject to a harmless error analysis.[5] *See, e.g., United States v. Willis,* 759 *F.*2d 1486, 1500 (11th Cir.), *cert. denied,* 474 *U.S.* 849, 106 *S.Ct.* 144, 88 *L.Ed.*2d 119 (1985); *Washington, supra,* 705 *F.*2d at 498; *Alessandrello, supra,* 637 *F.*2d at 138 n. 11; *Boone, supra,* 483 *A.*2d at 1140; *State v. Caraballo,* 62 *Haw.* 309, 615 *P.*2d 91, 100 (1980); *Noble v. State,* 293 *Md.* 549, 446 *A.*2d 844, 854 (1982); *Commonwealth v. Owens,*

---

[5] *See* Jay M. Zitter, Annotation, *Validity of Jury Selection As Affected By Accused's Absence From Conducting of Procedures For Selection and Impaneling of Final Jury Panel For Specific Cases,* 33 *A.L.R.4th* 429 (1984), for a thorough review of the manner in which this subject has been treated in other jurisdictions.

414 *Mass.* 595, 609 *N.E.*2d 1208, 1215 (1993); *People v. Marsh,* 108 *Mich.App.* 659, 311 *N.W.*2d 130, 133 (1981), *cert. denied,* 459 *U.S.* 854, 103 *S.Ct.* 119, 74 *L.Ed.*2d 104 (1982); *State v. Payne,* 328 *N.C.* 377, 402 *S.E.*2d 582, 588 (1991); *State v. Whaley,* 290 *S.C.* 463, 351 *S.E.*2d 340, 341 (1986); *Wesley v. State,* 749 *S.W.*2d 933, 935 (Tex.Ct.App.1988). The federal courts have generally applied the constitutional harmless error standard enunciated by *Chapman v. California,* 386 *U.S.* 18, 24, 26, 87 *S.Ct.* 824, 828–29, 17 *L.Ed.*2d 705, 710–11, *rehearing denied,* 386 *U.S.* 987, 87 *S.Ct.* 1283, 18 *L.Ed.*2d 241 (1967), which places the burden upon the government to prove the harmlessness of the error beyond a reasonable doubt, *i.e.,* that the error did not contribute to the conviction or affect the substantial rights of the defendant. *Camacho, supra,* 955 *F.*2d at 957; *United States v. Alikpo,* 944 *F.*2d 206, 209 (5th Cir.1991); *Washington, supra,* 705 *F.*2d at 498; *Alessandrello, supra,* 637 *F.*2d at 138 n. 11; *Crutcher, supra,* 405 *F.*2d at 244.

██ Here, the trial judge violated *R.* 3:16(b), and deprived defendant of his fundamental right to be present during the *in camera* individual *voir dire* conducted in chambers after defendant had expressly requested to be present.[6] Although defendant was present for a substantial portion of the general *voir dire* he was absent from that phase which dealt with the central theme of the prosecution's case, *i.e.,* that the crime was homosexually related. One of the State's witnesses, defendant's ex-girlfriend, claimed that defendant laughed and spit at men standing outside gay bars, called them "faggots," stated that he liked to rob them and would "kill them in a New York second." Since there was testimony that the victim was homosexual and the evidence suggested that defendant was bisexual because he was a frequent patron of gay bars, it was important that defendant be present so

---

[6] The judge's observation that, for security reasons, defendant should be excluded, was not a valid basis to deny defendant's request. Where security is a problem, the right to be present can be satisfied by various means including use of close-circuit television and the opportunity to consult with counsel. *Washington, supra,* 705 *F.*2d at 497 n. 4.

that he could have formed his own impressions of the jurors' demeanor and visceral reactions when they responded to the questions about homosexuality. Further, the *in camera voir dire,* which consumed over forty pages of transcript, cannot be characterized as "very limited." *Washington, supra,* 705 *F.*2d at 498. Moreover, as stated, it dealt with a subject that was at the heart of the case, rather than a peripheral matter such as pretrial publicity. *See Alessandrello, supra,* 637 *F.*2d at 135.[7]

The State reasons that defendant can show no prejudice because he had already exercised all of his peremptory challenges before the *in camera voir dire* took place. But this assertion of "harmlessness" is bottomed on a second, fundamental error committed by the trial judge not raised by defendant, namely conducting the *in camera* questioning of the jurors *after* defendant's peremptory challenges had been exhausted. The procedure distorted the jury selection process and impaired defendant's right to exercise knowingly his peremptory challenges. This is so because defense counsel exercised all of defendant's challenges before the jurors' possible bias regarding homosexuality was fully explored.

The procedure followed by the judge violated *N.J.S.A.* 2A:78–4, now repealed, which provided in pertinent part:

---

[7] We stress that our holding that defendant had the right to be present during *voir dire* is predicated on the fact that he specifically asked to be present during the proceeding. In addition, we expressly do not address the question whether a defendant's rights are violated when a limited *voir dire* of a juror is conducted at side-bar in counsel's presence. *See United States v. Sherwood,* 98 *F.*3d 402, 407 (9th Cir.1996) (defendant waived right to be present during side-bar *voir dire* of jurors regarding pretrial publicity by failing to indicate he wished to be present); *Cardinal v. Gorczyk,* 81 *F.*3d 18, 20 (2d Cir.1996) (defendant waived Sixth Amendment right to observe individual side-bar *voir dire* where defendant was not purposely excluded from the proceedings, he was aware of his right to see and hear the *voir dire* proceedings and he made no affirmative request to participate); *Washington, supra,* 705 *F.*2d at 497 (because a defendant's right to be present during a side-bar *voir dire* is "infrequently exercised and usually delegated to counsel," such right shall be deemed to have been waived unless a "specific request is made for the defendant to participate at" the bench examination of prospective jurors).

*Upon the trial of any cause,* civil or criminal, *all parties may,* within the discretion of the court, *question any person summoned as a juror, after his name is drawn from the box* and before he is sworn as a juror, and without the interposition of any challenge, *to elicit information for the purpose of determining whether or not to interpose a peremptory challenge,* and of disclosing whether or not there is cause for challenge.... The questioning shall be conducted under the supervision and control of the trial judge *and in open court.*[8]

[Emphasis added.]

It also violated *R.* 1:8–3(a), which provides that *"[f]or the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box* after the required number are drawn...."* (Emphasis added). Since the information elicited during *voir dire* is for the purpose of determining whether to interpose a peremptory challenge, the *voir dire* must, of necessity, precede the exercise of peremptory challenges. *Cf. State v. Wagner,* 180 *N.J.Super.* 564, 566–68, 435 *A.*2d 1190 (App.Div.1981) (*N.J.S.A.* 2A:74–1, which defines the manner for impanelling a jury in a criminal case, could not be ignored when selecting a jury, and irregularities in jury selection process constituted reversible error because, when the integrity of the process is at stake, prejudice is not a precondition to successfully asserting impairment of the fundamental right of proper jury selection); *see also United States v. Olano,* 507 *U.S.* 725, 736, 113 *S.Ct.* 1770, 1779, 123 *L.Ed.*2d 508, 521 (1993) (quoting *United States v. Atkinson,* 297 *U.S.* 157, 160, 56 *S.Ct.* 391, 392, 80 *L.Ed.* 555, 557 (1936)) (the Court of Appeals should correct even a plain "forfeited" error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings").

A *voir dire* designed to expose potential bias is essential to ensure an impartial jury. *State v. Hunt,* 115 *N.J.* 330, 348, 558 *A.*2d 1259, *reconsideration denied,* 117 *N.J.* 152, 564 *A.*2d 873 (1989). "Only through a thorough *voir dire* can counsel determine

---

[8] *N.J.S.A.* 2A:78–4 was repealed subsequent to defendant's trial by *L.* 1995, *c.* 44, § 1. The new statute, which was enacted in its place, *N.J.S.A.* 2B:23–10a, contains substantially similar language.

whether to seek disqualification of a person for cause and to make informed decisions in exercising peremptory challenges." *State v. Oates,* 246 *N.J.Super.* 261, 267, 587 *A.*2d 298 (App.Div.1991).

Although the right of peremptory challenge is not a fundamental right guaranteed by the federal or State Constitutions, it is nevertheless a "substantial right" provided by statute, *N.J.S.A.* 2B:23–13b and court rule, *R.* 1:8–3(d). *State v. DiFrisco,* 137 *N.J.* 434, 468, 645 *A.*2d 734 (1994), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *State v. Singletary,* 80 *N.J.* 55, 62, 402 *A.*2d 203 (1979). The goal of peremptory challenge is to secure an impartial jury. *DiFrisco, supra,* 137 *N.J.* at 468, 645 *A.*2d 734. A party exercises a peremptory challenge not because a juror's views prevents or substantially impairs his or her performance as a juror, but because the party may "detect some disfavorable leaning." *Id.* at 469, 645 *A.*2d 734. Subject to constitutional strictures, "a peremptory challenge can rest on a good reason, a bad reason, or no reason at all." *State v. Scher,* 278 *N.J.Super.* 249, 263, 650 *A.*2d 1012 (App.Div.1994), *certif. denied,* 140 *N.J.* 276, 658 *A.*2d 299 (1995). Thus, "[a]ny diminution of or infringement upon that legislatively granted opportunity [to exercise the challenges] deprives defendant of as fair a trial as our rules permit." *Singletary, supra,* 80 *N.J.* at 71, 402 *A.*2d 203 (Clifford, J., dissenting).

The exercise of peremptory challenges presupposes a knowing participation by the accused. Here, during the general *voir dire,* when defendant was present and still had peremptory challenges, the single question about homosexuality was nonspecific; the jurors were simply told that there may be a homosexuality theme to the proofs presented by the State. The trial judge then recognized, and properly so, that extensive questioning of each juror as to his or her potential bias because of the homosexuality issue was necessary. The fatal error was that the judge chose not only to conduct this *voir dire* outside of defendant's presence, but did so *after* defendant had exercised all his peremptory challenges. This procedure had the effect of nullifying defendant's "substantial

right" to a full and probing *voir dire* in his presence, and to exercise all of his peremptory challenges predicated on his "feel" of each juror's reaction to the questioning.

For example, we know that one juror, number four, informed the judge that he was not "sympathetic at all with homosexuality." Another juror, number nine, a homosexual, expressed an opinion during the *in camera voir dire* that he felt there was no relationship between an individual's sexual preference and his or her veracity. Both jurors remained on the jury. During the *in camera* proceeding other jurors may have exhibited in a nonverbal way a discomfort or even distaste concerning the homosexuality issue. Because defendant was not present, he had no chance to "detect some disfavorable leaning," *DiFrisco, supra*, 137 *N.J.* at 469, 645 *A.*2d 734, or other "unaccountable prejudices" derived from the "bare looks and gestures" of the jurors as they answered the judge's questions. *Crutcher, supra*, 405 *F.*2d at 244. In any event, because defendant no longer had any peremptory challenges, he would have been unable to exercise his "substantial right" to excuse the jurors had he wished to do so. Because of the importance of the homosexuality theme, defendant may have exercised his challenges based on the juror's responses to the judge's inquiry on that issue, rather than exercise them based on the juror's occupation, relation to law enforcement officers, prior jury service, and their answers to other similar questions asked during the general *voir dire.*

This is not a case where a defendant challenges an erroneous ruling on the sequence in which peremptory challenges are to be made; such an error is not necessarily fatal to a defendant's "full exercise of his right to challenge jurors peremptorily." *State v. Brunson*, 101 *N.J.* 132, 145, 501 *A.*2d 145 (1985). Rather, we deem the error committed akin to instances where a juror fails to disclose a fact which may bear upon his or her ability to be impartial.

For example, in *State v. Thompson*, 142 *N.J.Super.* 274, 361 *A.*2d 104 (App.Div.1976), it was disclosed after trial that a juror

had served as a guard in a correctional institution about twenty-five years before trial and was presently serving on a municipal juvenile board. *Id.* at 278, 361 *A.*2d 104. The juror had not responded to a *voir dire* question whether he had ever been employed in any law enforcement work at any level in government. *Id.* at 278–79, 361 *A.*2d 104. In reversing the conviction, we determined that it was of no significance whether the juror's failure to respond was deliberate or inadvertent. *Id.* at 280, 361 *A.*2d 104. We held that the juror's silence was "misleading to defendant and prejudiced him in a valuable incident of the trial process—the exercise of a peremptory challenge." *Ibid.* We quoted from our Supreme Court's holding in *Wright v. Bernstein,* 23 *N.J.* 284, 129 *A.*2d 19 (1957):

> The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. The jury is an integral part of the court for the administration of justice, and on elementary principles its verdict must be obedient to the court's charge based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. The parties to the action are entitled to have each of the jurors who hears the case impartial, unprejudiced and free from improper influences. *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61 [80 *A.*2d 302] (1951).
>
> What happened in this case had the effect of nullifying the purpose of the examination and was as effective as though the trial court had denied the right of challenge. The denial of the right of peremptory challenge is the denial of a substantial right. When it is not waived by conduct, it is prejudicial *per se* and harmful, and a party is not required to make an affirmative showing that the denial of his right to peremptory challenge had resulted in prejudice and injury to his cause of action on the merits.
>
> [*Thompson, supra,* 142 *N.J.Super.* at 281, 361 *A.*2d 104 (quoting *Wright, supra,* 23 *N.J.* at 294–95, 129 *A.*2d 19).]

Thus, we held that "the denial of the right of peremptory challenge in the context of the subject matter of the question is 'prejudicial *per se* and harmful.'" *Thompson supra,* 142 *N.J.Super.* at 281, 361 *A.*2d 104 (quoting *Wright, supra,* 23 *N.J.* at 295, 129 *A.*2d 19). We found that "the misleading silence of the juror herein amounted to a denial of the right of peremptory challenge—a substantial right in the concept of a fair and impartial trial." *Thompson, supra,* 142 *N.J.Super.* at 281, 361 *A.*2d 104.

In this case, unlike *Thompson* where the right to a single peremptory challenge was frustrated, defendant was deprived of the right to exercise in a wholesale fashion his challenges based on the homosexuality theme after a meaningful individual *voir dire*. Nevertheless, we need not apply the *Wright/Thompson* "prejudicial *per se*" rule here. Suffice it to say we are satisfied that the State has failed to prove beyond a reasonable doubt that the errors committed during the *voir dire* were harmless beyond a reasonable doubt. *Chapman, supra,* 386 *U.S.* at 24, 26, 87 *S.Ct.* at 828–29, 17 *L.Ed.*2d at 710–11. It may at least be argued that defendant's nonpresence during the *in camera voir dire* may not have resulted in reversible error by itself. However, we are convinced that this error, together with the error in conducting the *in camera voir dire* after defendant had exercised his peremptory challenges, deprived defendant of his "substantial right" of a knowing and meaningful *voir dire* procedure.

Hence, we reverse defendant's conviction of aggravated manslaughter and the weapons possession charges and remand these counts for a new trial. However, since defense counsel admitted during summation that defendant was guilty of the theft charge and defendant also acknowledged his guilt during his testimony, we affirm this conviction because we are convinced defendant would have been convicted of this count regardless of the jury's composition.

## II

Defendant also raises an array of challenges to the admission of the PCR–DNA test results. For purposes of the retrial, we reject the argument and conclude that the test results were properly admitted. Because of the complexity of the PCR–DNA procedure and the uniqueness of the issues, an extended discussion is merited.

Defendant first argues that the trial judge erred in failing to conduct a testimonial hearing on the question whether PCR–DNA

testing is reliable and generally accepted within the scientific community.

Expert testimony in the area of scientific evidence or the results of scientific tests is admissible only if the technique or mode of analysis used by the expert has a sufficient scientific basis to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the truth. *State v. Kelly*, 97 *N.J.* 178, 210, 478 *A.*2d 364 (1984); *State v. Hurd*, 86 *N.J.* 525, 536, 432 *A.*2d 86 (1981); *Marcus, supra*, 294 *N.J.Super.* at 274, 683 *A.*2d 221. In *Kelly, supra*, 97 *N.J.* at 210–11, 478 *A.*2d 364, our Supreme Court adopted the "general acceptance" test originally enunciated in *Frye, supra*, 293 *F.* at 1014. *Kelly* holds that in order to introduce expert testimony in a new field of scientific inquiry, the proponent bears the burden to establish its "general acceptance" and thereby its reliability, through one of three methods:

(1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance.

[*Kelly, supra*, 97 *N.J.* at 210, 478 *A.*2d 364.]

Our appellate courts have, in criminal cases, generally adhered to this "general acceptance" standard. *See State v. Spann*, 130 *N.J.* 484, 509–10, 617 *A.*2d 247 (1993); *State v. J.Q.*, 130 *N.J.* 554, 572–73, 617 *A.*2d 1196 (1993); *Marcus, supra*, 294 *N.J.Super.* at 275, 683 *A.*2d 221; *but see State v. Fertig*, 143 *N.J.* 115, 126–27, 668 *A.*2d 1076 (1996) (court declined to abandon guidelines for admission of hypnotically-refreshed testimony pronounced in *Hurd, supra*, 86 *N.J.* at 525, 432 *A.*2d 86, despite majority of state courts holding that testimony is *per se* inadmissible); *Cf. Rubanick v. Witco Chemical Corp.*, 125 *N.J.* 421, 449, 593 *A.*2d 733 (1991) (in toxic tort litigation, a theory of causation not yet enjoying general acceptance may nevertheless be sufficiently reliable if based on sound, adequately-founded scientific methodology involv-

ing data reasonably relied upon by experts in field); and *see Daubert v. Merrell Dow Pharm., Inc.,* 509 *U.S.* 579, 591–94, 113 *S.Ct.* 2786, 2796–97, 125 *L.Ed.*2d 469, 482–83 (1993).

 Even accepting the more demanding "general acceptance" standard, we are persuaded that no testimonial hearing was necessary to accept the PCR–DNA results in this case, since the State satisfied each of the three tests enunciated in *Kelly.* The State offered several reports from experts which established that PCR amplification is widely used in genetic typing, forensic science, molecular biology, and as a diagnostic tool in the medical profession. The reports also explain that the reliability and validity of DQ alpha tests have been demonstrated by blind trials, population studies and analyses performed on over 10,000 samples by laboratories, including Cetus Corporation, the FBI and numerous other scientific centers. The testing procedure has been the subject of over 3,000 publications. This wide recognition and use of the PCR–DNA procedure establishes its general acceptance in the scientific community.

Moreover, the State presented voluminous authoritative, scientific studies supporting use of the PCR–DNA technique, indicating "that the scientific community accepts the premises underlying the proffered testimony." *Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364. One article describes the PCR DQ alpha system as a "powerful approach for analyzing the genetic structure of populations." Rhea Helmuth, et al., *HLA–DQa Allele and Genotype Frequencies in Various Human Populations, Determined by Using Enzymatic Amplification and Oligonucleotide Probes,* 47 *Am. J. of Hum. Genet.* 515, 520 (1990) (the Helmuth Article). Finally, recent judicial opinions make clear the general acceptance of DNA testing as a forensic device. *Marcus, supra,* 294 *N.J.Super.* at 267, 683 *A.*2d 221, and cases cited therein. Specifically, the PCR technique has gained general acceptance. *See Williams, supra,* 252 *N.J.Super.* at 369, 599 *A.*2d 960, and cases cited therein; *Seritt v. State,* 647 *So.*2d 1, 3–4 (Ala.Crim.App.1994); *Harmon v. State,* 908 *P.*2d 434, 438–41 (Alaska.Ct.App.1995); *Redding v.*

*State,* 219 *Ga.App.* 182, 464 *S.E.*2d 824, 827–28 (1995); *State v. Hill,* 257 *Kan.* 774, 895 *P.*2d 1238, 1247 (1995); *State v. Grayson,* 1994 *WL* 670312 (Minn.Dist.Ct.1994); *People v. Palumbo,* 162 *Misc.*2d 650, 618 *N.Y.S.*2d 197, 200–01 (Sup.Ct.1994); *State v. Gentry,* 125 *Wash.*2d 570, 888 *P.*2d 1105, 1115–18, *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 131, 133 *L.Ed.*2d 79 (1995); *State v. Russell,* 125 *Wash.*2d 24, 882 *P.*2d 747, 759–68 (1994), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 2004, 131 *L.Ed.*2d 1005 (1995). Consequently, no testimonial hearing was necessary to establish its general acceptance.

### III

Defendant next argues that the PCR–DNA test results should have been excluded because the State failed to sustain its burden of proving that Dr. Blake followed proper protocol and procedures in his testing.

During the extensive *Frye* hearing, the trial judge received competing expert testimony concerning the PCR–DNA analysis and DQ alpha genotyping performed by Dr. Blake. Dr. Blake has an extensive background in forensic science, and is qualified as an expert in PCR technology by courts in sixteen states, including New Jersey. He explained in detail the manner by which his assistant, Jennifer Mihalovich, a forensic serologist, removed the sperm samples from the white jeans, and prepared an epithelial fraction and a sperm fraction from the stains. Dr. Blake explained the technical procedure whereby the sperm cells were purified and suspended in a buffer salt solution and placed in an oven resulting in the release of their DNA. After the DNA was purified, it was analyzed to determine its quantity and whether the DNA was degraded.

According to Dr. Blake, a portion of the sample was placed in tubes containing a PCR–DQ alpha "cocktail" supplied by the Cetus Corporation. Ultimately, PCR amplification was accomplished by cycling the material in tubes through different temperature plateaus. After amplification, the tubes were removed from

the thermal cycler. The amplified DNA was hybridized with typing strips containing probes reflecting the six common DQ alpha alleles. A complex procedure, described by Dr. Blake, was then performed resulting in the amplified DQ alpha genes binding with the probes on the strips to which they corresponded. Colored dots appeared on the strips indicating the presence of alleles. This method of typing is referred to as the reverse dot blot method.

Dr. Blake determined that the DQ alpha type of Anctil's blood and hair roots was 1.1, 3. Defendant's blood revealed a DQ alpha type 1.2, 1.3. The epithelial cell fraction from area A of the white jeans and the sperm fractions from areas A and B of the white jeans disclosed DQ alpha type 1.2, 1.3. The epithelial cell fraction from area B of the white jeans was too weak to be typed. Thus, Dr. Blake concluded that the sperm on the white jeans could not have come from Anctil, but that it was genetically compatible with defendant.

Dr. Blake testified that, with minor exceptions, he followed the protocol developed by Cetus Corporation contained in a brochure that accompanied its kit.[9] He admitted that neither he nor Ms. Mihalovich are certified as forensic scientists by any state licensing agency since such certifications do not exist in any state. Moreover, he acknowledged there is no regulatory body that certifies individuals to perform PCR testing or which sets the protocol to be followed when conducting such tests.

During the *Frye* hearing the State also presented the testimony of Dr. Hague Kazazian, Director of the Center for Medical Genetics at Johns Hopkins Medical School. Dr. Kazazian, board certified in medical genetics, has authored many publications concerning PCR, and has used PCR extensively in his laboratories at Johns Hopkins. Although he has never observed Dr. Blake or anyone at Dr. Blake's laboratory conduct a PCR test, he reviewed Dr. Blake's laboratory bench notes and report and concluded that

---

[9] Dr. Blake assisted Cetus in developing the protocol.

the proper protocol had been utilized and that Dr. Blake's test results were scientifically valid and accurate.

In addition, Dr. Henry Lee, a forensic science professor with a Ph.d in biochemistry, also vouched for the correctness of the protocol followed by Dr. Blake and the reliability of the test results. Dr. Lee had performed approximately 300 PCR DQ alpha tests in his laboratory. After reviewing all of the notes and data relating to Dr. Blake's testing procedure, Dr. Lee concluded that scientifically reliable protocol for PCR DQ alpha gene testing had been followed. Dr. Lee also stated that although there are no official national guidelines concerning PCR amplification, all scientists performing the procedure follow the written guidelines provided by Cetus Corporation, as did Dr. Blake in this case.

We are satisfied that the trial judge's conclusion that Dr. Blake followed the appropriate protocol for PCR–DNA testing is supported by substantial, credible evidence in the record as a whole. *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.2d* 809 (1964). Clearly, the State met its burden of proving that Dr. Blake possessed sufficient expertise to offer his intended testimony. *State v. Berry*, 140 *N.J.* 280, 289, 658 *A.2d* 702 (1995). He had the requisite knowledge, skill, experience and training in PCR–DNA testing to render the opinion. *See N.J.R.E.* 702. Nor can Drs. Kazazian's and Lee's qualifications and ability to render an opinion as to proper protocol be challenged. Further, the evidence presented showed that the procedures followed by Dr. Blake had built-in safeguards for the extraction and amplification of the DNA. Control samples were utilized to test for contamination. Lastly, defendant presented no expert witness to challenge any aspect of the testing protocol followed by Dr. Blake and his assistant.

■ We reject the notion that the tests were rendered inadmissible because of the State's failure to call Dr. Blake's assistant, Ms. Mihalovich. Dr. Blake was permitted to rely on facts or data made known to him prior to his testimony if of a type reasonably relied on by experts in forming and rendering opinions upon the

subject in question. *N.J.R.E.* 703. Indeed, an expert's testimony may be based on the work done or even hearsay evidence of another expert, particularly when, as here, the latter's work is supervised by the former. *State v. Stevens,* 136 *N.J.Super.* 262, 264, 345 *A.*2d 804 (App.Div.1975).

■ The fact that Dr. Blake's laboratory had not been "certi-fied" by any regulatory agency was not dispositive. While such accreditation may be desirable, its absence does not mean that the laboratory performing the test failed to follow appropriate proce-dures. *See Russell, supra,* 882 *P.*2d at 765–66.

## IV

Defendant also argues that the trial judge erred in admitting the population frequency statistics used by the State to quantify the PCR test results. The thrust of defendant's argument is that Dr. Blake's population statistics used to quantify the test results did not take into account "substructuring," a concept recognizing that members of subgroups of the universal Caucasian and Black population tend to mate within their respective subgroups because of such factors as geography, religion and ethnicity. Consequent-ly, based on actual, rather than general mating procedures, genet-ic differences will occur between subgroups.

Dr. Blake testified that the 1.2, 1.3 genotype found on the white jeans and in defendant's blood were compared to a collection of data of genotypes of various racial groups from reference samples in his laboratory taken from unrelated suspects and victims throughout the country. He had performed DQ alpha testing on 730 Caucasians and found that twenty-three had the 1.2, 1.3 genotype. This figure was comparable to a scientific standard, the Hardy–Weinberg equilibrium, which presupposes the expected number of Caucasians with the 1.2, 1.3 genotype to be 21.9. According to Dr. Blake, the expected frequency with this genotype based on the Hardy–Weinberg equilibrium is 3%. He arrived at that percentage by multiplying the frequency of one allele by the

frequency of the other allele in the genotype and multiplying the result by two. This is referred to as the "product rule."

Dr. Blake also presented the results of an article he co-authored (the Helmuth Article) after having submitted 324 samples of Caucasians tested in his laboratory for inclusion in a study of genotype frequencies for the HLA–DQ alpha locus. This article concluded that since the observed DQ alpha genotype frequencies did not deviate significantly from the expected frequencies based on the Hardy–Weinberg equilibrium in the Caucasian and other populations surveyed, the DQ alpha marker can be utilized for purposes of identification in forensic cases because genotype frequencies can be reliably estimated from observed allele frequency data. Dr. Blake also testified that population studies conducted by the FBI disclosed results that were consistent with his data and that of the Helmuth Article. Finally, the experts who reviewed the procedures used by Dr. Blake unanimously agreed that the testing was performed in accordance with proper protocol.

There has been substantial debate concerning whether population "substructures" have statistical significance in the matching of DNA profiles. *See Marcus, supra,* 294 *N.J.Super.* at 280–81, 683 *A.2d* 221. The debate is described in the Committee on DNA Technology in Forensic Science, National Research Council, *DNA Technology in Forensic Science* (1992) (1992 NRC Report) as follows:

> [P]opulation frequencies often quoted for DNA typing analyses are based not on actual counting, but on theoretical models based on the principles of population genetics. Each matching allele is assumed to provide statistically independent evidence, and the frequencies of the individual alleles are multiplied together to calculate a frequency of the complete DNA pattern. Although a databank might contain only 500 people, multiplying the frequencies of enough separate events might result in an estimated frequency of their [sic] all occurring in a given person of 1 in a billion. Of course, the scientific validity of the multiplication rule depends on whether the events (i.e., the matches at each allele) are actually statistically independent.
>
> . . . .
>
> The validity of the multiplication rule depends on the assumption of absence of population substructure. Population substructure violates the assumption of statistical independence of alleles. In a population that contains groups each with

different allele frequencies, the presence of one allele in a person's genotype can alter the statistical expectation of the other alleles in the genotype. For example, a person who has one allele that is common among Italians is more likely to be of Italian descent and is thus more likely to carry additional alleles that are common among Italians. The true. genotype frequency is thus higher than would be predicated by applying the multiplication rule using the average frequency in the entire population.

[*Marcus, supra,* 294 *N.J.Super.* at 281, 683 *A.*2d 221 (quoting 1992 NRC Report [10] at 10–12 (footnote omitted)).]

Here, Dr. Louis Levine, a professor of biology at City College of New York, testified on defendant's behalf that Dr. Blake's results were skewed because they failed to take into account "substructures" within the Caucasian and Black population along geographic lines. It was his view that Dr. Blake's population frequency statistics should not be admitted into evidence because there was no adequate database for New Jersey and therefore it was not known in what manner the New Jersey population might be substructured. It was Dr. Levine's opinion that a scientifically accepted database would be one containing 600 random individuals equally distributed throughout New Jersey, provided defendant does not belong to a special subgroup. Dr. Levine's inquiries disclosed that defendant does not belong to any particular subgroup.

In written submissions after the pretrial hearing was closed, defendant and Dr. Levine also argued that the "ceiling principle" should be utilized in the event the test results are admitted into evidence. The "ceiling principle" assumes the existence "of some degree of population substructure and generates more conservative population frequency statistics than the product rule." *Marcus, supra,* 294 *N.J.Super.* at 282, 683 *A.*2d 221.

In *Marcus,* we recently addressed the substructure debate in the context of the RFLP fingerprinting method. We first recognized the "overwhelming authority in other jurisdictions sustaining the admissibility of such evidence." *Id.* at 282–83, 683 *A.* 2d 221

---

[10] The 1992 NRC Report was referring to RFLP "fingerprinting" DNA analysis, rather than the PCR analysis performed by Dr. Blake.

and cases cited therein. Citing recent out-of-state authority, we rejected challenges to DNA testing based on the "substructure" argument, concluding that any continuing debate among experts in the field of population genetics regarding the calculation of population frequencies of matching DNA print patterns does not affect the general acceptance of DNA analysis within the scientific community, and thus should not result in the exclusion of such evidence in criminal trials. *Id.* at 287, 683 *A.*2d 221. Thus, the State may present evidence of population frequencies calculated by use of the "product rule," the "ceiling principle"[11] or any other method that has a legitimate scientific basis, and the defendant remains free to present conflicting expert opinion testimony regarding population frequency calculations. *Id.* at 288, 683 *A.*2d 221.

*Marcus* is dispositive here. The State presented substantial testimony by trained and knowledgeable experts that PCR–DNA testing and DQ alpha amplification and typing are well established and generally accepted scientific methods and sufficiently reliable to warrant the admission of test results in criminal cases. Not only did experts present detailed testimony as to the methodology employed regarding the procedures used, but presented generally accepted methodology for collecting data on genotypes and application of the product rule to calculate the frequency of occurrence in Caucasian and Black populations. Because the DNA results were based on these scientifically valid principles and derived from scientifically valid procedures, the results were not excludable simply because there may exist a debate concerning the effect of ethnic substructures, or because of the availability of an alternative "ceiling principle" to calculate population frequency statistics for forensic purposes. Such con-

---

[11] The *1996 NRC Report* indicates that the "ceiling principle" overstates the effect of population substructure in calculating the population frequencies of a combination of matching DNA print patterns and consequently its use for forensic purposes is unnecessary. *Marcus, supra,* 294 *N.J.Super.* at 282, 683 *A.*2d 221.

flicting theories go to the weight, rather than to the admissibility of the DNA evidence. *Id.* at 291, 683 *A.*2d 221.

 We also reject defendant's argument that the population frequency statistics used by the State to quantify the PCR results were unreliable because the size of the database was too small. Defendant does not cite any case law to support this argument. Rather, he places sole reliance on the testimony of Dr. Levine who stated that the number of Caucasian individuals in Dr. Blake's database was too small, given the population of the United States. However, Dr. Levine was not qualified to give such an opinion; his specialty is in population genetics as opposed to human population genetics. The predominant part of Dr. Levine's research involved population genetics of mice and fruit flies as opposed to humans. The relevant, qualified scientific community with regard to the topic of population statistical analyses of DNA tests results are human population geneticists. *See Harmon, supra,* 908 *P.*2d at 442.

On the other hand, the State presented Dr. Conneally who specializes in human population genetics. He testified that the databases used by the State were adequate for purposes of frequency estimates and in fact, were "larger than the vast majority of sample sizes for estimating gene frequencies that we normally use in our day-to-day routine."

We reject each of defendant's challenges to the PCR–DNA test results, and conclude that they were properly admitted into evidence.

## V

During the retrial, the State may not admit any evidence concerning defendant's fingerprinting and incarceration for unrelated crimes. *See N.J.R.E.* 404(b) (defendant's Points IV and V). Also, we agree with defendant that defense witness Steven Van Dusen's statement to Investigator Donovan was not admissible as a prior inconsistent statement. *See Evid. R.* 20 (now *N.J.R.E.*

607) and *Evid. R.* 22 (now *N.J.R.E.* 613); *State v. Silva,* 131 *N.J.* 438, 444–45, 621 *A.*2d 17 (1993). We express no view as to whether the statement may be admissible as substantive evidence in the State's case-in-chief.

## VI

In view of our reversal of the aggravated manslaughter and weapons possession offenses, we do not address defendant's contentions that the sentences imposed thereon were manifestly excessive. As to the five-year term imposed for the theft conviction, we find no abuse of the sentencing discretion. *See State v. O'Donnell,* 117 *N.J.* 210, 564 *A.*2d 1202 (1989); *State v. Ghertler,* 114 *N.J.* 383, 555 *A.*2d 553 (1989); *State v. Roth,* 95 *N.J.* 334, 471 *A.*2d 370 (1984). We also conclude that the judge's calculations of jail-time (1,549 days) and gap-time (1,200 days) credits is factually supported and legally sound. *R.* 3:21–8; *N.J.S.A.* 2C:44–5b(2); *State v. Edwards,* 263 *N.J.Super.* 256, 263, 622 *A.*2d 919 (App.Div. 1993); *Sheil v. New Jersey State Parole Board,* 244 *N.J.Super.* 521, 527, 582 *A.*2d 1279 (App.Div.1990), *appeal dismissed,* 126 *N.J.* 308, 598 *A.*2d 872 (1991); *State v. Richardson,* 208 *N.J.Super.* 399, 414, 506 *A.*2d 43 (App.Div.), *certif. denied,* 105 *N.J.* 552, 523 *A.*2d 188 (1986). However, the judgment of conviction, which simply states that defendant is entitled to "2,749" days credit, should be modified to reflect the specific jail and gap-time credits.

We have considered defendant's remaining contentions and are satisfied they are clearly without merit. *R.* 2:11–3(e)(2). *See Evid. R.* 55 (now *N.J.R.E.* 404(b)); *Evid. R.* 63(13) (now *N.J.R.E.* 803(c)(6)); *Evid. R.* 4 (now *N.J.R.E.* 403); *State v. Martini,* 131 *N.J.* 176, 255, 619 *A.*2d 1208 (1993); *State v. Marshall,* 123 *N.J.* 1, 60–61, 586 *A.*2d 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993); *State v. Koedatich,* 112 *N.J.* 225, 298, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989); *State v. Ramseur,* 106 *N.J.* 123, 320–22, 524 *A.*2d 188 (1987); *State v. Matulewicz,* 101 *N.J.* 27, 29, 499 *A.*2d 1363 (1985); *State v. Garfole,* 76 *N.J.* 445, 453, 388 *A.*2d 587

(1978); *State v. Dancyger*, 29 *N.J.* 76, 91–92, 148 *A.*2d 155, *cert. denied*, 360 *U.S.* 903, 79 *S.Ct.* 1286, 3 *L.Ed.*2d 1255 (1959); *State v. Bull*, 268 *N.J.Super.* 504, 512, 634 *A.*2d 101 (App.Div.1993), *certif. denied*, 135 *N.J.* 304, 639 *A.*2d 303 (1994); *State v. Darrian*, 255 *N.J.Super.* 435, 454–55, 605 *A.*2d 716 (App.Div.), *certif. denied*, 130 *N.J.* 13, 611 *A.*2d 651 (1992); *State v. Bass*, 221 *N.J.Super.* 466, 484, 535 *A.*2d 1 (App.Div.1987), *certif. denied*, 110 *N.J.* 186, 540 *A.*2d 182 (1988).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.