918 A.2d 14

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL COLBERT, A/K/A MICHAEL A. COLBERT, DEFENDANT–RESPONDENT.

Argued November 14, 2006—Decided April 4, 2007.

16

*Catherine A. Foddai,* Assistant Prosecutor, argued the cause for appellant (*John L. Molinelli,* Bergen County Prosecutor, attorney).

*Arthur J. Owens,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LONG delivered the opinion of the Court.

At issue in this appeal is the retroactivity of our decision in *State v. W.A.*, 184 *N.J.* 45, 875 *A.*2d 882 (2005). In particular, defendant, Michael Colbert, who fully participated in voir dire sidebars through the use of the lawyer-shuttle system,[1] contends that the rule announced in *W.A.* requires nothing less than physical presence at sidebar and that his constitutional right to be present at all stages of his trial was violated. The Appellate Division agreed and invalidated defendant's convictions. For the reasons that follow, and specifically because we part company with the Appellate Division in connection with retroactivity, we reverse and reinstate the judgment of the trial court.

## I.

During the jury voir dire at his trial for two counts of second-degree sexual assault, *N.J.S.A.* 2C:14–2b, and one count of third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a, defendant asked to be present at sidebar questioning of potential jurors. The trial judge denied the request and directed that defendant's counsel engage in the lawyer-shuttle system.

Twenty-eight potential jurors were examined at sidebar. Of those, twenty-five were excused for cause, leaving, in the box, only three jurors who had been questioned at sidebar. At that point, defendant reiterated his earlier objection to the proceedings:

[DEFENSE COUNSEL]: Judge ... [a]s you know, my client requested the right to be at sidebar conference with each individual juror. And the Court indicated it was uncomfortable with that procedure and asked me to be a go-between.

My client's position is that unless he's there and hears the inflection in their voice, sees their face, that he's not able to adequately participate in the jury selection. But that's already been decided by this Court.

Again the judge disagreed:

THE COURT: Well, for the record, I've excused almost every juror who might have had a concern or felt [he] would not be fair and impartial.... So I have

---

[1] Under that system, the lawyer attends each sidebar and thereafter confers with his client regarding what has transpired.

excused quite a few from sidebars. And the few that I've kept that might have been a concern [—] you expressed to me what your concern was.
[DEFENSE COUNSEL]: Yes, sir.
THE COURT: [Defendant], nothing personal. Just ... my procedure of doing the trial. I never have allowed sidebars with the defendants. So nothing personal to you. It's just the way I do it.

Immediately following that colloquy, the judge took a short recess, at which point defendant had the chance to discuss with his counsel the three remaining jurors who had been questioned individually at sidebar but not excused. Although there is no record of the conversations between defendant and his counsel, we note that defendant has never claimed and does not now contend that he did not discuss with his lawyer, as part of the lawyer-shuttle process, the substance of what was disclosed during the sidebars.

When the trial reconvened, neither the prosecution nor the defense peremptorily challenged any of the three potential jurors who were examined at sidebar, despite the fact that defendant had earlier unsuccessfully challenged one of those jurors for cause. Two of the three jurors subsequently served on the jury. The third was an alternate. In all, defendant exercised only nine of his twenty peremptory challenges.

The jury found defendant guilty of both counts of sexual assault and not guilty of endangering the welfare of a child. He was later sentenced to concurrent custodial terms of nine years, each with a five-year period of parole ineligibility.

On his motion for a new trial, defendant advanced, among other issues, his right of presence at the voir dire sidebars. During the motion, defense counsel stated that "my client was very actively involved in jury selection; in fact, not a single juror was selected here without the input of my client; in fact, he himself chose certain jurors to be selected off the panel or requested other jurors to stay." Nevertheless, counsel asserted that his client had "the unabridged constitutional right to be present at all phases of his trial, including jury selection...."

The trial judge again disagreed:

> Both attorneys were present during the sidebar. And I asked [defendant's] attorney to relay any information told [to] him by the jurors.
>
> [Defendant] was in the courtroom during the questioning, and was able to observe potential jurors. There was nothing blocking [defendant] from the jurors at the sidebar, and he was probably less than twenty feet away. He was able to see the jurors' expressions and demeanor.
>
> This case is not like the *Dishon* or *Lomax* case[s]. Here, [defendant] was present during the sidebar questioning. The attorneys were allowed to listen to the conference. After the conference took place, [defendant's] attorney relayed the information to him.
>
> Unlike *Dishon*, ... where the jurors were questioned in the Judge's chambers, and the defendant could not evaluate their demeanor, [defendant] in this case was able to see the jurors' expressions. In addition, [defendant's] attorney was present during the sidebar, unlike the defendant's attorney in *Lomax*. Thus, the defendant had the ability to judge the jurors and remove them, if necessary.
>
> Although the State has to prove harmless error beyond a reasonable doubt, this Court did not find any error. The attorneys were present during the sidebar, and [defendant] was in the courtroom. He was able to observe and hear any information relayed.

The judge noted that "there were no jurors that I recall that I did not excuse myself if there was any even hint that they could not be fair and impartial"; that "there were no jurors that were kept on this jury on the opposition of defense counsel"; and that "constitutional rights were not violated."

On appeal, defendant again contended that his right to a fair trial was abridged "because the trial judge denied him the right to be present during sidebar conferences with potential jurors." The Appellate Division rejected that argument and affirmed defendant's convictions:

> [D]efendant was in the courtroom and could observe the gestures and expressions of the juror[s]. Defense counsel was instructed by the trial judge to discuss the juror[s'] response[s] with defendant. Additionally, the sidebars were conducted before any peremptory challenges were exercised, not after they had all been exhausted as in *Dishon*.

The panel concluded:

> A defendant enjoys a constitutional right to be present at all stages of the trial, including the selection of the jury, and in this case, he was effectively present during the entire jury selection process. The procedure employed here did not deny defendant the right to participate in the exercise of his peremptory challenges. Defendant had the opportunity to consult with counsel before the defense exercised any challenge. There is no showing that any potential juror which [defendant] challenged peremptorily was not excused by the court. Under the

circumstances, we discern no constitutional error by questioning certain potential jurors at sidebar without defendant present.

Defendant filed a petition for certification. While that petition was pending, *W.A.* was decided. We granted the petition and summarily remanded the matter to the Appellate Division for reconsideration in light of *W.A. State v. Colbert*, 185 *N.J.* 27, 878 *A.*2d 846 (2005).

On remand, defendant argued that, under *W.A.*, the lawyer-shuttle system was inadequate to preserve his right to be present at sidebar conferences. The State countered that any error was harmless. The Appellate Division held that "exclusion of defendant from sidebar conferences during jury selection was error, and that the makeshift lawyer-shuttle system did not adequately protect his right" under *W.A.* The panel, therefore, reversed and remanded the matter for a new trial. We granted the State's petition for certification. 186 *N.J.* 603, 897 *A.*2d 1058 (2006).

## II.

The State advances two arguments on appeal: that *W.A.* should be given purely prospective application; and that, even if *W.A.* is applied retroactively, any error that arose was harmless.

In response, defendant argues: that *W.A.* did not establish a "new rule of law" and, thus, applies to his case; and that, even if it did set forth a new rule, he is entitled to its benefits. Finally, defendant argues that the error in his trial cannot be considered harmless.

## III.

In *W.A., supra,* we addressed a situation in which a defendant was excluded from sidebar voir dire; had no real opportunity to consult with his lawyer; was not made aware of what transpired during sidebar; exercised his peremptory challenges without full information; and ultimately claimed that, had he been fully in-

formed, he would have challenged a particular juror. *184 N.J.* at 67, 875 *A.*2d 882.

In declaring that a constitutional violation occurred in *W.A.,* we reaffirmed a defendant's right of presence at his own trial, including voir dire, and recognized the many ways in which sidebar participation had been secured in the past—including physical presence, electronic devices, the struck-jury system,[2] and the lawyer–shuttle system. *Id.* at 60, 875 *A.*2d 882 (citing *State v. Davenport,* 177 *N.J.* 288, 309–10, 827 *A.*2d 1063 (2003)).

Because W.A. received none of those substitutes and thus was denied the basic constitutional right of presence, we went on to engage in a harmless error analysis. *Id.* at 66–67, 875 *A.*2d 882. Turning to the merits of W.A.'s claim, we concluded that the error was not harmless because "a defendant ... *who knew* of [the juror's] background and of the answers she gave, would be loath to allow her to serve on his jury" and because "defendant may well have peremptorily challenged [the juror] *had he heard* her responses." *Ibid.* (emphasis added).

■ In *W.A.,* we also recognized that all methods of securing a defendant's presence during voir dire sidebars are not equal. Identifying physical presence in the absence of security concerns as optimal, we also approved electronic methods; struck-jury; and finally, the lawyer-shuttle system. *Id.* at 59, 875 *A.*2d 882. Regarding the lawyer-shuttle system, we stated:

> Because that method interposes the lawyer between the client and the juror, it is not as effective for peremptory challenge purposes as the direct observation-hearing methods. Nevertheless, it is a potential way to secure a defendant's "presence" and participation in voir dire when direct participation is impractical. [*Id.* at 61, 875 *A.*2d 882.]

Importantly, in *W.A.* we explicitly held that "presence at sidebar need not always mean physical presence"; that each of the substituted methods could satisfy the imperative of presence,

---

[2] When a jury is "struck" a defendant can remain in his seat during individual voir dire because it takes place in open court with all other jurors outside the courtroom. *W.A., supra,* 184 *N.J.* at 60–61, 875 *A.*2d 882.

depending on the circumstances; and that, in the future, courts should consider the hierarchy of substitutes in sequential order. *Id.* at 59–62, 875 *A.2d* 882. Thus, for example, where there are no security concerns in a courtroom, actual presence should be considered first. However, even in the absence of security concerns, where electronic methods are available and defendant can see the potential jurors' faces and expressions and hear their voices, the judge may substitute that method because it provides everything that actual presence would afford. In short, the circumstances will dictate the procedure.

At its core, then, *W.A.* is made up of two distinct parts: (1) a restatement of a defendant's right of presence during voir dire, including the methods used to secure such presence; and (2) a new template for the implementation of the various methods. Those elements of *W.A.* require separate analyses for retroactivity purposes.

Because the right of presence, securable by various means, is a well-settled principle of constitutional jurisprudence, it follows that it is not a new rule of law but one that has always applied. *See State v. Whaley*, 168 *N.J.* 94, 99, 773 *A.2d* 61 (2001); *State v. Smith*, 346 *N.J.Super.* 233, 236–37, 787 *A.2d* 276 (App.Div.2002) (citing *State v. Dishon*, 297 *N.J.Super.* 254, 267, 687 *A.2d* 1074 (App.Div.), *certif. denied*, 149 *N.J.* 144, 693 *A.2d* 112 (1997)); *see also R.* 3:16(b) (stating defendant shall be present at every stage of trial, including impaneling of jury). Thus, as defendant argues, a retroactivity analysis is unnecessary. *State v. Burstein*, 85 *N.J.* 394, 403, 427 *A.2d* 525 (1981). Indeed, we have no warrant to consider limiting the retroactive effect of such a decision. *Ibid.*

 On the contrary, *W.A.'s* imposition of a new approach to the established methods for securing voir dire presence constituted a break with past practice and thus a "new rule." Where a new rule is concerned, four possible options are available:

(1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying

the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted.

[*Burstein, supra,* 85 *N.J.* at 402–03, 427 *A.*2d 525 (citing *State v. Nash,* 64 *N.J.* 464, 468–70, 317 *A.*2d 689 (1974)).]

 In choosing among those options, we consider three factors: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." *State v. Fortin,* 178 *N.J.* 540, 647, 843 *A.*2d 974 (2004) (quoting *State v. Knight,* 145 *N.J.* 233, 251, 678 *A.*2d 642 (1996)).

 Applying those factors, we emphasize that before *W.A.,* the judicial system long relied on methods other than physical presence at sidebar to afford a defendant effective voir dire participation. *See Davenport, supra,* 177 *N.J.* at 309, 827 *A.*2d 1063; *State v. Cook,* 330 *N.J.Super.* 395, 415, 750 *A.*2d 91 (App.Div.), *certif. denied,* 165 *N.J.* 468, 757 *A.*2d 309 (2000). It was only when none of those methods were made available that convictions were overturned. *See State v. Lomax,* 311 *N.J.Super.* 48, 56–57, 709 *A.*2d 277 (App.Div.1998); *Dishon, supra,* 297 *N.J.Super.* at 269–70, 687 *A.*2d 1074. Further, no hierarchical distinctions between those methods were ever formally recognized.

Under the earlier scheme, what was critical was that defendant had a real opportunity to participate in decision-making at the voir dire stage of his trial. Importantly, when we established the new template in *W.A.,* we did not declare that the entrenched prior scheme had denied defendants the constitutional right of presence. *See W.A., supra,* 184 *N.J.* at 60–62, 875 *A.*2d 882 (holding various extant methods for defendant's presence during sidebar voir dire appropriate under certain circumstances). Rather, we approved the use of each of the substituted methods, recognizing that some

are better than others and, therefore, should be resorted to first. *Ibid.*

In that context, we see no reason to give the unanticipated rule of *W.A.* anything other than full prospective application. To apply it retroactively would punish the justifiable reliance of the judicial system on the old rule, which we did not declare unconstitutional, and would upend settled expectations and force reconsideration of long resolved matters. *See State v. Abronski*, 145 *N.J.* 265, 267–68, 678 *A.*2d 659 (1996). There is simply no counterweight to those negatives that would justify retroactivity.

That is neither to detract from the continuing force of *W.A.* nor to suggest that judges are now free to disregard it. We view it as the proper template for securing a defendant's right of presence. We hold here only that the procedural methodology recognized in *W.A.* was intended for purely prospective application. Accordingly, so long as a defendant who was tried prior to *W.A.* was afforded an effective opportunity to participate in voir dire (albeit not in strict conformity with the hierarchical procedure set forth in *W.A.*), his constitutional right of presence was not impaired.

By that measure, we are satisfied that defendant received his constitutional entitlement. He had an unobstructed view of the prospective jurors; consulted with his lawyer after each sidebar; admitted that he was "very actively involved in jury selection," that "not a single juror was selected here without [his] input," and that "he himself chose certain jurors to be selected off the panel or requested other jurors to stay"; and, most importantly, to this day has never asserted that he did not know or understand the substance of what had occurred at sidebar. In other words, defendant was as fully present during voir dire as the Constitution requires and no error occurred.

## IV.

For those reasons, we reverse the judgment of the Appellate Division and reinstate defendant's convictions.

Justice RIVERA–SOTO, concurring in the result.

In *State v. W.A.*, 184 *N.J.* 45, 59, 875 *A.*2d 882 (2005), we held that, "by its terms, *Rule* 3:16 provides a defendant with the right of presence at every stage of his trial, including sidebar conferences during jury selection." In that case, we explained that "a defendant's exclusion from sidebar, after having requested presence, and in the absence of a substituted process such as the use of technology, [does not] automatically warrant[ ] reversal[,]" and that "each case is subject to a harmless error analysis." *Id.* at 64, 875 *A.*2d 882. We stated that "a defendant's absence from the sidebar examination of a juror who does not deliberate in the case is necessarily harmless." *Ibid.* Further, we noted that in the event a defendant is excluded from the sidebar examination of a juror who is seated and deliberates in the case, "reversal will not be automatic but will depend on the facts." *Id.* at 65, 875 *A.*2d 882.

This appeal requires that we determine whether *W.A.*'s precepts have retroactive application and, if so, how they are to be applied. The majority interprets *W.A.* to mean that "*W.A.* is made up of two distinct parts: (1) a restatement of a defendant's right of presence during voir dire, including the methods used to secure such presence; and (2) a new template for the implementation of the various methods." *Ante,* 190 *N.J.* at 22, 918 *A.*2d at 19 (2007). Based on that interpretation, the majority concludes, as a substantive matter, that "the right of presence, securable by various means, is a well-settled principle of constitutional jurisprudence" and, therefore, "it follows that it is not a new rule of law but one that has always applied." *Ibid.* Distinguishing between the substantive right of presence and its procedural implementation, the majority reads *W.A.* as "imposi[ng] a new approach to the established methods for securing voir dire presence [that] constituted a break with past practice and thus a 'new rule.' " *Ibid.* The majority then analyzes what retroactive effect is to be given to that "new rule" and "see[s] no reason to give the unanticipated rule of *W.A.* anything other than full prospective application." *Id.*

at 24, 918 *A.*2d at 20. The majority reasons that "[t]o apply [the unanticipated procedural portion of rule of *W.A.*] retroactively would punish the justifiable reliance of the judicial system on the old rule, which we did not declare unconstitutional, and would upend settled expectations and force reconsideration of long resolved matters." *Ibid.* (citation omitted). It thus concludes that "[t]here is simply no counterweight to those negatives that would justify retroactivity." *Ibid.*

I disagree. In my view, the aggregate of the substantive and procedural portions of the rule adopted in *W.A.* was a new rule of law that should be given "pipeline retroactivity" effect, "that is, this new rule applies in [*W.A.*], in future cases, and in any case still on direct appeal at the time this new rule is set forth." *State v. Cummings,* 184 *N.J.* 84, 99, 875 *A.*2d 906 (2005). Because defendant's direct appeal was pending before the Appellate Division when we decided *W.A.,* the rule of *W.A.* should apply in this appeal. However, although defendant had a right to be present during these sidebars and he was denied that right, defendant has failed to show how that denial was clearly capable of producing an unjust result. Thus, in the absence of any proof of harm and because only three jurors who were examined at sidebar in fact were seated on the petit jury yet defendant had eleven unused peremptory challenges when the jury as a whole was seated, the exclusion of defendant from the sidebar examinations of these jurors was harmless. I therefore concur in the judgment reversing the judgment of the Appellate Division and reinstating defendant's convictions and sentence.

I.

*W.A.* clearly sets forth the governing rule in respect of a defendant's presence at sidebar during jury *voir dire*: "If a defendant seeks to be present at sidebar during *voir dire* he should be accommodated *as far as security will allow.*" *W.A., supra,* 184 *N.J.* at 60, 875 *A.*2d 882 (emphasis supplied). *W.A.* recognizes that, in its application, this rule is not absolute. There-

fore, "[i]n the event that safety issues militate against a defendant's physical presence at a *voir dire* sidebar, other methods should be employed to guarantee his meaningful participation in the jury selection process." *Ibid.* We have explained that "[t]hose methods include the use of technology[,]" *ibid.* (citations omitted), or "a modified use of the struck-jury system[,]" *ibid.* (citations omitted). We also have explained that "[i]f all of those methods are unavailable ... the judge may resort to the lawyer-shuttle system." *Id.* at 61, 875 *A*.2d 882. We have emphasized that

when the lawyer-shuttle system is used, the lawyer must confer with his client after each sidebar interview that involves more than innocuous scheduling-type matters. In addition, if the lawyer-shuttle system is employed and a defendant so requests, the judge should take a recess before defendant's peremptory challenges are exercised to allow him to listen to the tape or review the court stenographer's notes of the sidebar colloquy with the non-excused jurors. By that approach, we balance the court's interest in security, the juror's in privacy, and the defendant's in presence.

[*Ibid.*]

Although certainly not favored, the use of the lawyer-shuttle system does not establish *per se* error. In that context, we "address[ed] whether a defendant's exclusion from sidebar, after having requested presence, and in the absence of a substituted process such as the use of technology, automatically warrants reversal[,]" *id.* at 64, 875 *A*.2d 882, and we held "that it does not and that each case is subject to a harmless error analysis." *Ibid.* Therefore, when addressing a defendant's exclusion from the individual *voir dire* of a potential juror who is seated and deliberates, the overriding rule remains that "reversal will not be automatic but will depend on the facts." *Id.* at 65, 875 *A*.2d 882.

## II.

I address first whether the rule of *W.A.* constitutes a "new rule of law" and, if so, what level of retroactivity should be given to it. This process "implicates a three-step analysis." *State v. Cummings, supra,* 184 *N.J.* at 97, 875 *A*.2d 906. In respect of the first step, we have explained that

we must engage in the threshold inquiry of whether the rule at issue is a new rule of law for purposes of retroactivity analysis. The test for determining whether the rule at issue is a new rule of law is whether a case announces a new rule when it breaks new ground or imposes a new obligation on the State or if the result was not dictated by precedent existing at the time the defendant's conviction became final. Stated differently, a decision involving an accepted legal principle announces a new rule for retroactivity purposes so long as the decision's application of that general principle is sufficiently novel and unanticipated.

[*Ibid.* (citations, internal quotation marks and editing marks omitted).]

Of course, if it is determined that no "new rule of law" has been announced, the analysis is at an end. However, if a "new rule of law" does result, we address the second step of the retroactivity analysis. In that second step,

three factors generally are considered to determine whether the rule is to be applied retroactively: (1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice.

[*Ibid.* (quoting *State v. Knight,* 145 *N.J.* 233, 251, 678 *A.*2d 642 (1996) (internal quotation marks omitted)).]

We have explained that "[a]lthough those three factors have received detailed attention in our retroactivity case law, our cases also indicate that the retroactivity determination often turns more generally on the court's view of what is just and consonant with public policy in the particular situation presented." *Ibid.* (citation and internal quotation marks omitted). We have emphasized that

[t]hose factors are not of equal weight, as the first factor, the purpose of the new rule, is often the pivotal consideration, and the second and third factors come to the forefront of the retroactivity analysis when the inquiry into the purpose of the new rule does not, by itself, reveal whether retroactive application of the new rule would be appropriate. We distinguish between the second and third factors as follows: the second factor inquires whether law enforcement agents justifiably relied on the old rule in performing their professional responsibilities, while the third factor in the retroactivity analysis, the effect a retroactive application would have on the administration of justice, recognizes that courts must not impose unjustified burdens on our criminal justice system.

[*Id.* at 97–98, 875 *A.*2d 906 (citations, internal quotation marks and editing marks omitted).]

If it is determined that a "new rule of law" has been announced and that the retroactive application of that new rule is appropriate, we must nevertheless determine "which retroactivity option is

to be chosen." *Id.* at 98, 875 *A.*2d 906. We have described the process as follows:

> This Court has four options in any case in which it must determine the retroactive effect of a new rule of criminal procedure. The Court may decide to apply the new rule purely prospectively, applying it only to cases in which the operative facts arise after the new rule has been announced. Alternatively, the Court may apply the new rule in future cases and in the case in which the rule is announced, but not in any other litigation that is pending or has reached final judgment at the time the new rule is set forth. A third option is to give the new rule "pipeline retroactivity," rendering it applicable in all future cases, the case in which the rule is announced, and any cases still on direct appeal. Finally the Court may give the new rule complete retroactive effect, applying it to all cases, including those in which final judgments have been entered and all other avenues of appeal have been exhausted. [*Ibid.* (citations omitted) (quoting *State v. Knight, supra,* 145 *N.J.* at 249, 678 *A.*2d 642).]

Those principles mandate the conclusion that *W.A.* established a new rule of law. Common practice prior to *W.A.* ordinarily limited attendance at sidebar conferences during jury *voir dire* to the judge, the potential juror, the prosecutor, and defense counsel. After *W.A.,* criminal defendants now have a recognized right to be present at sidebar conferences during jury selection, albeit that right is not absolute. The purpose of the rule announced in *W.A.* was to give further meaning to the right of a criminal defendant to be present at his own trial and such right is advanced by a retroactive application. Moreover, in light of the earlier Appellate Division decisions in both *State v. Dishon,* 297 *N.J.Super.* 254, 687 *A.*2d 1074 (App.Div.), *certif. denied,* 149 *N.J.* 144, 693 *A.*2d 112 (1997), and *State v. Lomax,* 311 *N.J.Super.* 48, 709 *A.*2d 277 (App.Div.1998), the degree of reliance placed on the old rule by those who administered it could not have been great. Finally, no evidence has been adduced to show that a retroactive application of *W.A.'s* rule would have an adverse effect on the administration of justice.

The pre-*W.A.* restriction on presence was not necessarily for safety reasons, but more typically for the reasons the trial court expressed in this record: to encourage candor by the potential juror under questioning that, due to its subject matter, demands enhanced privacy. Because that practice and its apparent univer-

sal application militate against full retroactive application of the rule of *W.A.*, "pipeline" retroactivity is warranted for those defendants whose direct appeals were pending when *W.A.* was decided. That is, this new rule should apply in this case, in future cases, and in any case still on direct appeal as of the date of our decision in *W.A.*, June 21, 2005.

Because the rule of *W.A.* should apply to those cases that were on direct appeal when *W.A.* was decided, and because defendant's petition for certification from his direct appeal was pending when *W.A.* was decided, defendant's claims that he was improperly excluded from the sidebar conferences during jury *voir dire* should be measured by the rule of *W.A.* It is to the application of *W.A.* to defendant's claims that I now turn.

### III.

Despite repeated requests, defendant was denied physical participation in the sidebar conferences with potential jurors during the *voir dire.* The reasons advanced by the trial court for doing so did not implicate questions of safety. Instead, the trial court was concerned that defendant's presence during the close setting of a sidebar conference would adversely affect the "jurors being able to speak freely[.]" That reason standing alone patently does not directly implicate the safety concerns that animated the exceptions carved out from *W.A.'s* rule. Under *W.A.*, then, the trial court's exercise of discretion to bar defendant from attending or participating in the sidebar individual *voir dire* of potential jurors "is subject to a harmless error analysis." *W.A., supra,* 184 *N.J.* at 64, 875 *A.*2d 882.

We have made clear that "[a]ny error or omission which does not prejudice a substantial right shall be disregarded by the trial court before, during and after trial[,]" *Rule* 1:7–5, and that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result," *Rule* 2:10–2. We have explained that

[t]he use with respect to "harmless error" of the same formula we had stated for "plain error" was simply an acknowledgment that after all was said, the question for the appellate court was simply whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits, and that upon that question the reviewing judge was inevitably remitted to his own conscientious judgment.

[*State v. Macon*, 57 N.J. 325, 338, 273 A.2d 1 (1971).]

The fact that an alleged error is of constitutional dimension does not change the fundamentals of the analysis. Although "[a]s to 'constitutional' errors, some may go so plainly to the integrity of the proceedings that a new trial is mandated without more[,]" we have also concluded that "[e]qually clear must be the proposition that not every 'constitutional' error can sensibly call for a new trial." *Ibid.* In sum, the yardstick to be applied is a practical one: "a new trial shall be ordered if there is a reasonable doubt as to whether the constitutional error contributed to the verdict." *Id.* at 340, 273 A.2d 1.

The trial court ruled, without objection, that defendant was able to see "the jurors' expressions and demeanor" and that he was not "blocked" or otherwise impeded in his view. Also, defendant's counsel was present at all sidebar conferences and was instructed by the trial court to—and did—consult with defendant in respect of the jurors who were not dismissed for cause.[3] Further, defen-

---

3 Nothing in this record supports the assertion on appeal that defendant's trial counsel failed to abide by the trial court's instructions to consult with defendant concerning each juror examined at sidebar. Indeed, during oral argument, defendant's appellate counsel was repeatedly asked whether defendant's trial counsel did or did not discuss with defendant the individual *voir dire* examinations of potential jurors at sidebar. Defendant's appellate counsel candidly admitted that there is nothing in the record "in respect of what discussion in fact occurred between [defendant's trial] counsel and the defendant in the lawyer-shuttle process so that [this Court] can ... make an informed decision." Tellingly, defendant's appellate counsel conceded that it is "the defendant's obligation" to make that record for appellate review.

Moreover, although not addressed by either party, an independent review of the videotape of the jury selection conclusively demonstrates that defendant's trial counsel did utilize the "lawyer-shuttle system" and consulted with defendant after each sidebar *voir dire* of the jurors who were not excused for cause. Although the *fact* of the consultations has been confirmed independent of the

dant admitted that he was "very actively involved in jury selection[,]" that "not a single juror was selected here without [his] input[,]" and that "he himself chose certain jurors to be selected off the panel or requested other jurors to stay." Finally, and most tellingly, defendant bears the burden of demonstrating that the lawyer-shuttle process directed by the trial court simply did not work, a burden defendant admittedly did not meet. Neither defendant nor his counsel ever averred that they did not discuss, as part of the "lawyer-shuttle" process, the substance of what was disclosed during the individual juror *voir dire* at sidebar. In that context, the fact that defendant had the means and the opportunity to review the tapes of the individualized sidebar *voir dire* juror conferences and to strike the potential jurors who were interviewed at sidebar but were not dismissed for cause leads inexorably to the conclusion that defendant's exclusion from the individual sidebar *voir dire* of potential jurors was not clearly capable of producing an unjust result.

The conclusions originally reached by the Appellate Division when it considered defendant's first appeal—that "[d]efendant was in the courtroom and could observe the gestures and expression of the juror[s; that d]efense counsel was instructed by the trial judge to discuss the juror[s'] response[s] with defendant[; and that] the sidebars were conducted before any [peremptory] challenges were exercised, not after they had all been exhausted"— were, and remain, correct. I therefore reject the truncated view of *W.A.* advanced by defendant and adopted by the majority. I rely, instead, on *W.A.'s* clear import: that a defendant has the right to be present during sidebar interviews of prospective jurors, that such right is not absolute, and that the denial of that right must be gauged under the harmless error standard. Thus, although I would find that defendant had a right to be present during these sidebars and that he was denied that right, I would ultimately hold that, under the circumstances, such denial was not

representations of the parties, the record remains barren in respect of the *substance* of those consultations.

clearly capable of producing an unjust result and, hence, the error was harmless.

## IV.

In contrast, then, to the majority's view, the substance of the rule of law announced in *W.A.*—that, save for security reasons, a defendant has an unqualified right of presence at the sidebar *voir dire* of individual jurors but that the denial of that right must be gauged under the harmless error standard—is entitled to pipeline retroactivity effect. However, applying that right to the facts in this case, the denial of that right was harmless. Therefore, I concur in the result reached by the majority reversing the judgment of the Appellate Division and reinstating defendant's conviction and sentence.

*For reversal and reinstatement*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.