**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5419-14T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TERRY A. UNDERWOOD,

      Defendant-Appellant.

_____

Submitted May 2, 2017 — Decided July 13, 2017

Before Judges Suter and Grall.

On appeal from the Superior Court of New
Jersey, Law Division, Monmouth County,
Indictment No. 98-10-2038.

Joseph E. Krakora, Public Defender, attorney
for appellant (John V. Molitor, Designated
Counsel, on the brief).

Christopher J. Gramiccioni, Monmouth County
Prosecutor, attorney for respondent (Paul H.
Heinzel, Assistant Prosecutor, of counsel
and on the brief).

PER CURIAM

    Defendant Terry A. Underwood appeals the denial of his

petition for post-conviction relief (PCR), in which he alleged

multiple errors of trial counsel that deprived him of

representation guaranteed by the United States and New Jersey Constitutions. Judge Francis J. Vernoia rejected those claims. State v. Underwood, Ind. No 98-10-2038 (Apr. 23, 2015) (hereinafter Underwood PCR).[1] We affirm.

The grand jurors for Monmouth County charged defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1)-(2), of Theresa Underwood, his pregnant wife and the mother of two of his children. The petit jury found defendant guilty, and the judge sentenced him to sixty years' imprisonment, thirty without possibility of parole and subject to terms of parole ineligibility and supervision under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judgment of conviction was entered on April 28, 2000.

On defendant's direct appeal from the judgment, we affirmed the conviction but remanded for elimination of the NERA components of the sentence, which did not apply to murder when defendant killed Theresa. State v. Underwood, No. A-5493-99 (App. Div. July 11, 2003) (slip op. at 40-41) (hereinafter Underwood). Defendant was resentenced in September 2003, and

---

[1] The April 23, 2015 order denying PCR also includes a denial of defendant's motion for a new trial based on newly discovered evidence, Rule 3:22-1. Defendant does not challenge that determination.

the Supreme Court denied certification in October. <u>State v.</u>
<u>Underwood</u>, 178 <u>N.J.</u> 35 (2003).

Defendant timely filed a petition for PCR on January 29,
2004, which he withdrew and re-filed on April 6, 2006.

I.

A discussion of the evidence admitted at trial provides
context for our consideration of the PCR proceeding. The
factual statement that follows summarizes the pertinent portions
of this court's statement of the facts on direct appeal. And,
it supplements that statement as necessary to address the issues
before us. <u>Underwood</u>, <u>supra</u>, slip op. at 4-15.

"At approximately 1:25 a.m., on August 25 1998, defendant,
a thirty-two year old dedicated bodybuilder and ex-football star
weighing roughly 200 pounds," called 911 from his home. <u>Id.</u> at
4. He advised that "his wife . . . was lying on the floor in
their bedroom 'bleeding from her head' and that there was blood
everywhere," and he said "he had just come into the room and did
not know what had happened" but it looked like his wife had
"slipped on something." <u>Ibid.</u> The operator told defendant to
start CPR, but he refused because "there was blood spattered on
the walls and . . . he was 'looking for a freaking gun shot.'"
<u>Ibid.</u> Indicating he had to call his and Theresa's mothers, he

hung up, but the 911 operator called back, and defendant told her it looked like his wife was not breathing.  Id. at 5.

Defendant was still on the phone with the operator when a policer officer arrived.  Id. at 5.  Wearing nothing other than undershorts and socks, defendant met the officer, who noted his "tremendous physique," and brought him to the bedroom, where Theresa was lying on the floor in "a huge pool of blood" near the "blood-covered bed."  Ibid.  Immediately seeing "obvious massive head and neck injuries," the officer attempted to but did not find a pulse and called for assistance.  Ibid.

Theresa's injuries were massive.  Dr. Jay Peacock of the Monmouth County Medical Examiner's Office determined she "bled to death between 9:30 p.m." on August 24 and "1:30 a.m." on August 25, 1998, "as a result of multiple sharp force injuries." Id. at 13.  Dr. Peacock counted "eighty-eight" stabs and cuts to her head, neck, upper back, chest, forearms and hands.  Id. at 12.  Although there were no sharp force injuries penetrating Theresa's uterus or fetus, Theresa's exsanguination caused "intrauterine asphyxia" that extinguished the nascent life.  Id. at 13.

In Dr. Peacock's opinion, the stabs penetrating Theresa's "skull would have required the exertion of extraordinary force of a degree [he had] seen only once or twice in his career."

Id. at 12-13.  One penetrated to a depth of five inches and pierced her brain; another "nearly" severed the bridge of her nose, and another carried the instrument through her wing bone and fractured a rib.  Id. at 12.

Theresa was also beaten.  Her lower and upper jaw and her right hand and forearm were fractured, two teeth were dislodged, and her abdomen, left breast, and thigh were bruised.  Ibid. Dr. Peacock concluded that the cuts and factures of Theresa's right hand and forearm were defensive injuries and some of her bruising could have been caused by a fist.  Ibid.

The weapon was never found, and there was no sign of forced entry to the apartment.  Id. at 13.  Remarkably, given the nature of injuries and blood loss, no blood was found anywhere in the apartment but the couple's bedroom.  Ibid.  A small amount of blood on one of the socks defendant was wearing when he met the police officer was tested and identified as Theresa's, but no other blood samples retrieved were tested for DNA.  Ibid.

The single latent fingerprint found in the apartment was not defendant's or that of any of three women defendant called on the night of the murder, or a fourth woman with whom he had a prior relationship.  Ibid.  The police had considered and excluded all four women as potential suspects, and all four

testified at trial, three for the State and one for defendant. Id. at 13-15, 40.

Defendant made several statements to the police on August 25. Id. at 5-11. Outside the apartment, an officer, who arrived while defendant was delivering the Underwoods' two young children to relatives, asked defendant what happened. Defendant said he did not know, because he had just come home. Id. at 5-6. He suggested the officer confirm his recent arrival by speaking to a toll-collector at a nearby booth on the Garden State Parkway and touching his still-warm motorcycle. Ibid. The motorcycle was warm, and the toll collector confirmed that he saw defendant between 12:00 and 12:30 a.m. on August 25. Id. at 6, 15.

When defendant returned to his living room after telling the officer he had just come home, he waved his arms, mumbled and slammed something down in the living room. An officer put his hand on defendant's arm and urged him to calm down, but defendant "flung the officer's hand away, 'whaling'" at him. Id. at 6. Concerned about defendant hurting someone, the officer told him he was not under arrest but handcuffed him and put him in a police car so he could compose himself. Ibid. Later, another officer approached the car, advised defendant of his Miranda rights, and asked if he was willing to give a

statement at the police station.  Defendant agreed to do that.
Ibid.

They arrived at the station at about 2:40 a.m., and at
11:05 p.m., defendant signed a statement admitting to punching
Theresa in the course of an argument over bills.  Id. at 6, 11.

Statements defendant made to officers between his arrival
at the station and noon on August 25 were suppressed, but
statements he made after noon were not.  Id. at 21.  At 6:55
p.m., officers advised defendant he had failed a polygraph and
asked, as they had earlier, if he wanted to leave, eat or call
an attorney.  Ibid.  The captain who made those offers testified
he did that "because he knew that they had 'had defendant for a
long time' and that they had 'entered the Twilight Zone.'"  Id.
at 20.  Defendant declined the offers, and around 9:00 p.m., he
said:  "I did it, I just snapped.  I started beating her.  I
don't know what I hit her with.  I got a lot of things going on
in my life and the pressure is just too much."  Id. at 10-11.
After making that admission, defendant wept.  Id. at 11.

By defendant's accounts of his activities on August 24 into
August 25, he came home from work at 5:00 p.m., napped, left for
the gym at 7:30 p.m., left the gym at 9:10 p.m., showered,
changed and left to watch sports at a friend's home, and got

home at about 1:20 a.m. via the Parkway. Id. at 7-8. Apart from the nap, he had not slept since he woke the prior morning.

The State's theory of the case was that defendant killed his wife and disposed of any physical evidence that would link him to the crime.

The defense had a three-pronged theory for its claim that the State's evidence did not establish guilt: 1) law enforcement rushed to suspect and accuse defendant; 2) the absence of forensic evidence, attributable to law enforcement's misconduct or incompetence and evidenced by, among other things, the State's failure to test Theresa's fingernail clippings for the perpetrator's DNA; and 3) defendant's inability to commit this crime and remove the evidence within the time-frame established by his statements and telephone records.

Defense counsel cross-examined the State's witness about the absence of forensic evidence and stressed it in his summation. For example, in commenting on the State's failure to test Theresa's fingernail clippings for DNA evidence, he referenced Dr. Peacock's testimony about Theresa's defensive injuries and urged the jurors to question whether such tests could have led to the identification of a killer who was still at large.

Defense counsel also urged the jurors to consider the impact of the many sleepless hours defendant had spent with the police when he finally admitted he snapped while arguing about bills with Theresa. Appealing to the jurors' common sense and experience and incorporating the captain's reference to defendant being in the "Twilight Zone," the attorney submitted that defendant was in the Twilight Zone when he admitted to beating Theresa. Referring to the television program with that title, he argued that the Twilight Zone is a place where "realities and dreams are distorted and strange and unusual circumstances happen at particular times." Referring to the totality of circumstances, he reminded the jurors that before defendant made that admission, he had come home and found "his wife brutally murdered" and his "whole life" changed. Then, he was thrown into a police car, had no sleep and had been with the police for 20 hours.

Although defense counsel obtained an expert report addressing the impact of sleep deprivation and circumstances leading up to defendant's incriminating statements, he did not call that expert as a witness.

II.

A. The filing of the petition for PCR and evidence obtained thereafter.

As previously noted, defendant timely filed and re-filed his petition for PCR. The authorizing order provides that the re-filed petition will be treated "as if within time and as a first PCR [petition] with all rights attendant to a first PCR." The April 6, 2006 petition submitted pursuant to that order alleged multiple failures of trial counsel.

Defendant sought discovery in support of his claims. On February 5, 2007, his PCR-counsel obtained the trial court's approval to have Theresa's fingernail clippings examined to determine if they contained biological material of sufficient quantity and quality to permit DNA testing. Those clippings had been preserved since Theresa's autopsy, and that autopsy included an autopsy of her fetus.

On subsequent application by defendant and the State, the court entered a consent order on December 10, 2007, authorizing DNA testing of the biological evidence detected on Theresa's fingernail clippings.

The DNA results identified Theresa as the source of or match for nine of the ten samples. One fingernail tested as a mixture of DNA. Further testing of the mixed-sample allowed the

lab to exclude defendant, but not Theresa or her fetus, as possible contributors.[2]

"Based on the loci which include all of the alleles from the fetus, the number of people who [could not] be excluded" as possible contributors to the mixed sample was small: "approximately" one in 22.7 million of the African-American" population; 1 in 3.90 million of the Caucasian population; and one in 1.34 million of the Hispanic population.

PCR counsel also obtained a second psychiatrist's opinion while defendant's petition was pending. Dr. Daniel P. Greenfield, MD, MPH, MS, focusing especially on statements made after noon on August 25, opined that the combined effect of defendant's sleep deprivation and his "perception" of a threat of "lethal injection" had "created a situation in which . . . [defendant's] [s]tatements should not have been considered valid, reliable, or accurate." He based that opinion on the "well-known" impacts of sleep-deprivation: impairment of "cognitive abilities," memory, perception and recollection of detail. Dr. Greenfield explained that defendant's "perception and understanding of his situation . . . as well as his ability

---

[2] The fetus's DNA used was obtained from liver tissue retrieved and preserved during the autopsy.

to have remembered accurately what had happened a number of hours before . . . were sufficiently adversely affected and impaired . . . to support" his opinion on the statements' invalidity and unreliability.

B.  Issues raised.

Following receipt of the DNA results and defendant's expert report, the parties submitted multiple briefs, which are listed in Judge Vernoia's opinion.  Underwood PCR, supra, slip op. at 7-9.  The judge heard argument on the petition and defendant's accompanying motion for a new trial on November 5, 2014.

On direct appeal, defendant raised and, with the exception of his objection to NERA penalties, this court rejected the following arguments:

> POINT I
>
> THE COURT BELOW ERRED IN DENYING UNDERWOOD'S MOTION TO SUPPRESS STATEMENTS WHERE THE STATEMENTS WERE THE PRODUCT OF UNDERWOOD'S ILLEGAL ARREST AND WERE INVOLUNTARILY GIVEN.
>
> > A. THERE WAS NO BREAK IN THE CAUSAL CHAIN BETWEEN UNDERWOOD'S ILLEGAL ARREST AND THE STATEMENTS THAT WERE ADMITTED AS EVIDENCE AGAINST UNDERWOOD.
> >
> > B. UNDERWOOD'S ADMISSIONS, MADE AFTER 16 HOURS OF QUESTIONING, WERE THE RESULT OF AN OVERBEARING OF UNDERWOOD'S WILL.

12

POINT II

BY SUPPRESSING THE FACT THAT UNDERWOOD WAS
SUBJECTED TO FOUR AND A HALF HOURS OF
UNINTERRUPTED QUESTIONING BY POLICE ON THE
MORNING OF AUGUST 25, 1998, THE TRIAL COURT
GROSSLY LIMITED THE JURY'S ABILITY TO FAIRLY
DETERMINE THE CREDIBILITY OF THE INCULPATORY
STATEMENTS MADE BY UNDERWOOD LATER THAT
EVENING.

POINT III

IT WAS ERROR FOR THE TRIAL COURT TO ADMIT
UNDERWOOD'S INCRIMINATING STATEMENTS, WHICH
SUGGESTED THAT UNDERWOOD ACTED IN THE HEAT
OF PASSION, AND THEN REFUSED TO INSTRUCT THE
JURY ON PASSION/PROVOCATION MANSLAUGHTER AS
A LESSER OFFENSE.

POINT IV

THE COURT SHOULD HAVE GRANTED UNDERWOOD'S
MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE
UNDERWOOD'S UNCORROBORATED ADMISSIONS WERE
THE ONLY DIRECT EVIDENCE OF GUILT.

POINT V

THE COURT'S FAILURE TO CONDUCT FOLLOW-UP
VOIR DIRE ON A JUROR'S FAMILIAL RELATIONSHIP
WITH THE MONMOUTH COUNTY PROSECUTOR
PREVENTED DEFENSE COUNSEL FROM MAKING AN
INFORMED DECISION AS TO WHETHER THE JUROR
HARBORED A BIAS IN FAVOR OF THE STATE,
THEREBY VIOLATING UNDERWOOD'S RIGHT TO A
FAIR AND IMPARTIAL JURY. (NOT RAISED BELOW)

POINT VI

THE IMPROPER ADMISSION OF UNDULY PREJUDICIAL
EVIDENCE, INCLUDING A POSTMORTEM X-RAY OF
THE FETUS WHICH WAS REMOVED FROM THE
VICTIM'S UTERUS, DEPRIVED UNDERWOOD OF A
FAIR TRIAL.

13                                          A-5419-14T4

POINT VII

THE PROSECUTOR WAGED AN IMPROPER AND HIGHLY
PREJUDICIAL ATTACK ON UNDERWOOD'S CHARACTER
BY CALLING GERTIESE DAVIS AND MYRA THOMAS AS
WITNESSES AT TRIAL, FOR THE SOLE PURPOSE OF
PORTRAYING UNDERWOOD AS A HABITUAL
WOMANIZER, BAD HUSBAND AND DECEITFUL PERSON.
(NOT RAISED BELOW)

POINT VIII

BECAUSE THE "NO EARLY RELEASE ACT" DOES NOT
APPLY TO THE CRIME OF MURDER, THE FIFTY-ONE-
YEAR PAROLE DISQUALIFIER THAT UNDERWOOD WAS
ORDERED TO SERVE MUST BE VACATED.

On this appeal defendant presents five arguments addressing

alleged deficient performance of trial counsel and a general

claim that an evidentiary hearing was required.[3]

POINT I

THIS COURT SHOULD REVERSE THE TRIAL COURT'S
DECISION TO DENY DEFENDANT'S PETITION FOR
POST-CONVICTION RELIEF WITHOUT AN
EVIDENTIARY HEARING.

A. DEFENDANT'S TRIAL COUNSEL WAS
INEFFECTIVE BECAUSE HE DID NOT
INVESTIGATE DNA TESTING THAT WOULD
HAVE DEMONSTRATED DEFENDANT'S
INNOCENCE. [Underwood PCR, supra,
slip op. at 19-34.]

---

[3] We have added citations to the portions of Judge Vernoia's
ninety-nine page opinion that address each issue and the
portions of this court's opinion on direct appeal that address a
claim of trial error related to these new claims of deficient
representation.

B. DEFENDANT'S TRIAL ATTORNEY WAS INEFFECTIVE WHEN HE DID NOT PRESENT PSYCHIATRIC TESTIMONY TO PROVE DEFENDANT'S STATEMENTS IN POLICE CUSTODY WERE NOT RELIABLE. [Underwood PCR, supra, slip op. at 42-53; see Underwood, supra, slip op. at 16-26 (describing circumstances under which defendant made statements to investigators and admissibility).]

C. DEFENDANT'S TRIAL ATTORNEY WAS INEFFECTIVE BECAUSE HE DID NOT EXERCISE A PEREMPTORY CHALLENGE ON THE MONMOUTH COUNTY PROSECUTOR'S UNCLE. [Underwood PCR, supra, slip op. at 53-60; Underwood, supra, slip op. at 33-34 (rejecting claim that judge should have dismissed juror).]

D. DEFENDANT'S TRIAL ATTORNEY SHOULD NOT HAVE WITHDRAWN HIS REQUEST FOR A PASSION/PROVOCATION MANSLAUGHTER CHARGE. [Underwood PCR, supra, slip op. at 61-65; Underwood, supra, slip op. at 27-30 (rejecting claim that judge should have charged this form of homicide sua sponte).]

E. DEFENDANT'S TRIAL ATTORNEY SHOULD HAVE CHALLENGED THE EXCLUSION OF DEFENDANT FROM SIDEBAR CONFERENCES. [Underwood PCR, supra, slip op. at 86-89.][4]

---

[4] Judge Vernoia addressed additional issues that defendant does not challenge.  They are:  entitlement to a new trial based on the DNA results, Underwood PCR, supra, slip op. at 34-42; failure to object to the State's summation, id. at 61-65; absence of advice on defendant's right to testify on the suppression motion, id. at 72-80; poor advice on defendant's

To obtain relief for ineffective assistance, a defendant must demonstrate deficient performance and resulting prejudice. To do that, a defendant must "identify specific acts or omissions that are outside the 'wide range of reasonable professional assistance' and . . . show prejudice by demonstrating 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Jack, 144 N.J. 240, 249 (1996) (quoting Strickland v. Washington, 466 U.S. 668, 689, 694, 104 S. Ct. 2052, 2065, 2068, 80 L. Ed. 2d 674, 694, 698 (1984)).

The reasonableness of an attorney's performance is assessed "on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, supra, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. Review is deferential; "a court must indulge a strong presumption that counsel's conduct falls well-within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the  circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694-95 (quoting Michel v. Louisiana, 350

---

right to testify at trial, id. at 80-86; failure to present evidence of third-party guilt, id. at 89-94; and cumulative error, id. at 94-98.

U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83, 93 (1995)); accord State v. Echols, 199 N.J. 344, 358 (2009). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchangeable." State v. Harris, 181 N.J. 391, 488 (2004) (quoting Strickland, supra, 466 U.S. at 690-91, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695), cert. denied, 545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005).

It is important for courts to consider realistically objections to counsel's decisions. They cannot focus "on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006).

To establish the necessary prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. An unreasonable professional error without a reasonable probability of changing the outcome has no import. Ibid. An evidentiary hearing on PCR is needed only when the

defendant has come forward with facts that would, if believed, make a prima facie showing of both deficient performance and resulting prejudice adequate to establish both by a preponderance of the evidence. State v. Preciose, 129 N.J. 451, 462-64 (1992).

We affirm Judge Vernoia's determination that defendant failed to establish entitlement, or a prima facie case of entitlement, to relief based on ineffective assistance of trial counsel on any ground asserted on this appeal. We affirm substantially for the reasons stated in his opinion as amplified here to stress the bases for our agreement.

Trial counsel's decision to forego DNA testing of fingernail clippings was consistent with his unmistakable and well-executed trial strategy. That strategy was to raise doubt about defendant's guilt by portraying the investigation and prosecution as the product of a rush to judgment that led the State to avoid collection of evidence that could have exonerated defendant.

In light of the defense strategy, DNA testing was not a no-risk or clearly advantageous option. Defense attorneys are required to provide the results of such tests to the State, Rule 3:13-3(b)(2)(A). Because defendant and Theresa lived together and shared a bed, his DNA potentially could have been found

under Theresa's fingernails due to contact wholly unrelated to the homicidal attack. Without any DNA evidence, counsel was free to argue a complete absence of forensic evidence implicating defendant. And, because there was no evidence that defendant had scratches indicative of a struggle, defendant did not need a DNA test to argue that Theresa did not scratch him. More important, the potential benefit of a test showing third-party DNA was minimal, because the presence of unidentified third-party DNA would not establish it got under Theresa's nail during the brutal homicide rather than some other prior contact or subsequent contact by a responder.

Viewed in context, there is no support for a finding of anything other than a reasonable strategic decision to forego testing of Theresa's fingernails. Defendant's claim based on trial counsel's failure to request DNA testing was properly denied on that basis.

We turn to defendant's contention that counsel's performance was deficient because he did not present expert testimony on the impact of sleep deprivation at the hearing on his motion to suppress or at trial.[5] In our view, Judge Vernoia

---

[5] Here, as in the trial court, defendant presents no argument based on Dr. Greenfield's report. See Underwood PCR, supra, slip op. at 53 n.9 (noting that "[no] argument or request is made based upon Dr. Greenfield's report").

properly denied relief on the ground that such expert testimony would be inadmissible because such matters are well-within the common understanding of average jurors who must decide whether a defendant's statements are reliable and truthful and well-within the common understanding of judges who must decide the issues in a suppression motions. State v. Kelly, 97 N.J. 178 (1984); see generally State v. Rosales, 202 N.J. 549, 565-67 (2010); State v. Free, 351 N.J. Super. 203, 220-21 (App. Div. 2002); cf. State v. King, 387 N.J. Super. 522 (App. Div. 2006) (discussing an expert report addressing defendant's particular mental condition and psychological make-up).

An attorney who refrains from offering inadmissible evidence is, quite obviously, well-within the range of competence. Harris, supra, 181 N.J. at 496-97 (rejecting a claim of ineffective assistance based on a failure to raise an objection that had no legal basis). For that reason, we affirm the denial of this claim.

Defendant's claims of ineffective assistance based on trial counsel's failure to exercise a peremptory challenge to a juror who disclosed his uncle-nephew relationship with the Monmouth County Prosecutor (Point I.C.) and failure to request defendant's inclusion in sidebar conferences during jury voir

dire (Point I.E.) are related, because the second claim is based solely on the judge's colloquy with that juror.

The juror, #735, readily disclosed the familial relationship, said he thought the judge and "both sides should be aware of it" and volunteered, "Won't bias my judgment, but I think you should be aware of the . . . situation."

Addressing that juror, the judge named all potential witness and attorneys involved in the case; the juror was not familiar with any.  He was a retired civil engineer, who had returned to work as a consultant; no other member of his family worked in law enforcement or law.  A member of his household had been arrested the year before, but the juror answered "No," when asked whether having that experience in his background would affect his ability to be fair and impartial.  He also answered "No," when asked whether he believed "male professional athletes who participate in contact sports are more aggressive in their personal lives than other people or more aggressive toward women than other people in society."  He further denied any racial bias or bias against partners in an interracial relationship. He confirmed he would be able to deal with the fact that although a fetus died there would not be separate charge and decide the case on the evidence at trial and the law as explained by the judge.

The judge inquired again about any bias or prejudice either for or against members of law enforcement. The juror said, "I have neither."

All of the foregoing occurred in open court. The only portion of this juror's voir dire conducted at sidebar was a discussion about the juror's "problem with the time element" of the trial.

On PCR, defendant offered no evidence of bias or prejudice apart from the uncle-nephew relationship. In his certification in support of this claim on PCR, defendant asserted:

> During jury selection, I asked my attorney to strike Juror #735, because he was the uncle of the county prosecutor. During the jury selection, there were conversations regarding jurors to which I was not privy. When my attorney returned to counsel table, he told me that Juror #735 would not have a problem being impartial. I again requested that he been [sic] stricken, but my attorney refused.

Assuming the attorney disregarded defendant's desire to strike the juror, there is no question that this was an unassailable and presumptively reasonable professional strategic decision based on the juror's balanced responses to the judge's searching questions. As such, the attorney's decision is not a viable basis for a finding of deficient performance.

Defendant's argument addressing exclusion from sidebar is

not supported by the facts asserted in his certification or the law. Apart from discussion of excusing this juror because of his work schedule, which the judge did not do, the voir dire was conducted in open court, and, as defendant's certification indicates, sidebar proceedings were conducted in conformity with the "lawyer-shuttle" method employed in this State until 2005 when the Supreme Court established a new rule of law on this point in State v. W.A., 184 N.J. 45 (2005). See State v. Colbert, 190 N.J. 14, 23-24 (2007).

Under the lawyer-shuttle employed before W.A., "what was critical was that defendant had a real opportunity to participate in decision-making at the voir dire stage of his trial." Id. at 23. Defendant's certification and the transcript of the voir dire establish that defendant had a real opportunity to participate in decision-making at the voir dire stage, and Colbert establishes that his attorney had no basis for requesting greater participation in 2000, when this jury was selected. See Harris, supra, 181 N.J. at 497.

Defendant's remaining claim, that trial counsel was ineffective because he withdrew a request for an instruction on passion/provocation manslaughter, does not require extensive discussion. If counsel had made the request, the trial judge could not have granted it "unless there [was] a rational basis

23

for a verdict convicting" defendant of passion/provocation manslaughter. N.J.S.A. 2C:1-8(e); see State v. Funderburg, 225 N.J. 66, 81 (2016). "[P]assion/provocation manslaughter is comprised of four elements: "[1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying." Funderburg, supra, 225 N.J. at 80 (quoting State v. Mauricio, 117 N.J. 402, 411 (1990) (citation omitted)).

"'The generally accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter.'" Funderburg, 225 N.J. at 80 (quoting State v. Crisantos, 102 N.J. 265, 274, (1986)). Accordingly, because the only evidence of provocation in this case was defendant's statement asserting that he snapped during a heated argument, he was not entitled to a charge on this lesser form of homicide. As previously noted, a trial counsel acts within the wide range of professional competence when he refrains from urging a judge to take a course that has no legal basis. Harris, supra, 181 N.J. at 497.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5419-14T4